THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF VOTES ON THE PLAN. ACCEPTANCES AND REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS RESERVE THE RIGHT TO AMEND, SUPPLEMENT, OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT PRIOR AND UP TO THE DISCLOSURE STATEMENT HEARING.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------- x
                          :

In re                       :        **Chapter 11**
                          :

**WESTERN GLOBAL AIRLINES, INC.,** *et al.,* :        **Case No. 23–11093 (KBO)**
                          :

         **Debtors.**[1]           :        **(Jointly Administered)**
                          :

-------------------------------------------------------- x

## DISCLOSURE STATEMENT FOR
## JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
## WESTERN GLOBAL AIRLINES, INC. AND ITS DEBTOR AFFILIATES

**WEIL, GOTSHAL & MANGES LLP**
Gary T. Holtzer (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors and Debtors in Possession*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Zachary I. Shapiro (No. 5103)
Amanda R. Steele (No. 5530)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Proposed Attorneys for Debtors and Debtors in Possession*

Dated:  August 30, 2023
          Wilmington, Delaware

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Western Global Airlines, Inc. (9265); Keldann Air LLC (6103); Jimsunn Air LLC (4789); B26344 LLC (2769); B26356 LLC (6221); M48411 LLC (3014); M48412 LLC (4041); M48415 LLC (8455); M48435 LLC (1643); M48512 LLC (5395); M48513 LLC (4817); M48542 LLC (5799); M48543 LLC (0630); M48544 LLC (5332); M48545 LLC (4459); M48546 LLC (6344); M48581 LLC (N/A); Mobility Air, LLC (3651); and NCF680C2 LLC (9966). The Debtors' principal offices are located at 9260 Estero Park Commons Blvd., Suite 200, Estero, FL 33928.

**A SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE CHAPTER 11 PLAN OF WESTERN GLOBAL AIRLINES, INC. AND ITS DEBTOR AFFILIATES (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "<u>PLAN</u>").  A COPY OF THE PLAN IS ANNEXED HERETO AS <u>EXHIBIT A</u>.**

**YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN, AS YOUR RIGHTS MAY BE AFFECTED.**

**THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS [●], 2023 (THE "<u>VOTING RECORD DATE</u>").**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., PREVAILING EASTERN TIME, ON [●], 2023, UNLESS EXTENDED BY THE DEBTORS.**

**<u>RECOMMENDATION BY THE DEBTORS</u>**

**THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND THE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN AND WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR THE PURPOSES OF SOLICITING, AS NECESSARY, SUFFICIENT ACCEPTANCES OF THE PLAN.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

THE OFFER, ISSUANCE, AND DISTRIBUTION UNDER THE PLAN OF (I) THE NEW CONVERTIBLE NOTES OFFERED AND ISSUED TO HOLDERS OF ALLOWED DIP CLAIMS, (II) NEW  COMMON STOCK OFFERED AND ISSUED TO THE HOLDER OF ALLOWED CREDIT FACILITY CLAIMS, AND (III) NEW WARRANTS OFFERED AND ISSUED TO THE HOLDERS OF UNSECURED NOTES CLAIMS IN CONNECTION WITH THE RESTRUCTURING TRANSACTIONS WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE.  SUCH SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(A)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE.  IN ADDITION, SUCH SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.

THE NEW COMMON STOCK ISSUED IN RESPECT OF THE NEW EQUITY INVESTMENT WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 4(A)(2) OF THE SECURITIES ACT AND/OR REGULATION D THEREUNDER. WITH RESPECT TO ANY SECURITIES ISSUED IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 4(A)(2) OF THE SECURITIES ACT AND/OR REGULATION D THEREUNDER, SUCH SECURITIES WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND CONSIDERED "RESTRICTED SECURITIES" (WITHIN THE MEANING OF RULE 144 UNDER THE SECURITIES ACT) AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR UNDER AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT AND/OR REGULATION D THEREUNDER, OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

**CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED CREDITOR RECOVERIES, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  CERTAIN OF THESE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF WORDS SUCH AS "BELIEVES," "EXPECTS," "PROJECTS," "INTENDS," "PLANS," "ESTIMATES," "ASSUMES," "MAY," "SHOULD," "WILL," "SEEKS," "ANTICIPATES," "OPPORTUNITY," "PRO FORMA," "PROJECTIONS," OR OTHER SIMILAR EXPRESSIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.  READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING THOSE IDENTIFIED IN SECTION VIII OF THIS DISCLOSURE STATEMENT.**

**THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT (AS DEFINED BELOW).**

**ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO, AND ARE A PART OF, THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN, AS NECESSARY, PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE OR IN CONNECTION WITH CONFIRMATION OF THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.**

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................................ 4

II. OVERVIEW OF THE COMPANY'S OPERATIONS ............................................. 9

    A.    Company's Founding and Organizational Structure ...................................... 9

    B.    Company's Business ........................................................................................ 9

    C.    Regulation of the Company's Business ........................................................ 10

    D.    Employee Workforce .................................................................................... 11

    E.    Directors and Officers .................................................................................. 11

    F.    Prepetition Indebtedness .............................................................................. 12

III. CIRCUMSTANCES LEADING TO COMMENCEMENT OF THESE CHAPTER 11 CASES ...................................................................................................................... 14

    A.    Operational and Financial Challenges ......................................................... 14

    B.    Restructuring Initiatives ............................................................................... 17

IV. THE CHAPTER 11 CASES ................................................................................... 20

    A.    Commencement of Chapter 11 Cases ........................................................... 20

    B.    First-Day Motions ........................................................................................ 20

    C.    DIP Financing and Cash Collateral .............................................................. 21

    D.    Retention of Chapter 11 Professionals ......................................................... 22

    E.    Appointment of Creditors' Committee ......................................................... 22

    F.    Statements and Schedules and Claims Bar Dates ......................................... 22

    G.    Exclusivity .................................................................................................... 22

    H.    Investigation and Debtor Releases ............................................................... 23

V. SUMMARY OF PLAN ............................................................................................ 23

    A.    Administrative Expense and Priority Claims ............................................... 23

    B.    Classification of Claims and Interests .......................................................... 25

    C.    Treatment of Claims and Interests ............................................................... 27

    D.    Means for Implementation ............................................................................ 30

    E.    Distributions .................................................................................................. 38

    F.    Procedures for Disputed Claims ................................................................... 42

    G.    Executory Contracts and Unexpired Leases ................................................ 44

    H.    Conditions Precedent to Confirmation of Plan and Effective Date .............. 47

    I.    Effect of Confirmation of Plan ..................................................................... 48

    J.    Retention of Jurisdiction .............................................................................. 52

K.     Miscellaneous Provisions ................................................................. 54

VI. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS ......................................................................................................... 60

VII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .......................... 61

A.     Consequences to the Debtors ......................................................... 62

B.     Consequences to U.S. Holders of Allowed Unsecured Notes Claims and General Unsecured Claims ............................................................. 65

C.     Backup Withholding ...................................................................... 68

VIII. CERTAIN RISK FACTORS TO BE CONSIDERED ...................................................... 68

A.     Certain Bankruptcy Law Considerations ....................................... 68

B.     Risks Relating to the Plan .............................................................. 70

C.     Risks Relating to Debtors' Business and Financial Condition ......................................... 70

D.     Factors Relating to Securities to Be Issued ................................... 71

E.     Risks Relating to Exit Obligations ................................................ 73

F.     Additional Factors ......................................................................... 74

IX. VOTING PROCEDURES AND REQUIREMENTS ....................................................... 75

A.     Voting Instructions and Voting Deadline ...................................... 75

B.     Parties Entitled to Vote ................................................................. 76

C.     Agreements Upon Furnishing Ballots ........................................... 77

D.     Change of Vote .............................................................................. 77

E.     Waivers of Defects, Irregularities, etc. ......................................... 77

F.     Miscellaneous ............................................................................... 77

X. CONFIRMATION OF PLAN ................................................................................... 78

A.     Confirmation Hearing .................................................................... 78

B.     Objections to Confirmation ........................................................... 78

C.     Requirements for Confirmation of Plan ........................................ 80

XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN ........................... 84

A.     Plan of Reorganization .................................................................. 84

B.     Alternate Sale Under Section 363 of Bankruptcy Code ................. 84

C.     Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law ................................ 84

XII. RECOMMENDATION OF DEBTORS ...................................................................... 85

EXHIBIT A:     Plan
EXHIBIT B:     Restructuring Support Agreement
EXHIBIT C:     Organizational Chart
EXHIBIT D:     Liquidation Analysis
EXHIBIT E:     Valuation Analysis
EXHIBIT F:     Financial Projections

# I.
## INTRODUCTION

Western Global Airlines, Inc. ("**Western Global**") and its debtor affiliates (collectively, the "**Debtors**," and together with their non-debtor affiliates, the "**Company**") submit this Disclosure Statement in connection with the solicitation of votes on the *Joint Chapter 11 Plan of Reorganization of Western Global Airlines, Inc. and Its Debtor Affiliates*, dated August 29, 2023 (the "**Plan**")[1] attached hereto as **Exhibit A**.  The Debtors commenced their chapter 11 cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on August 7, 2023 (the "**Petition Date**").

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan.  This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events contemplated in the Chapter 11 Cases, and certain documents related to the Plan.

The Debtors commenced these Chapter 11 Cases to implement a comprehensive financial restructuring (the "**Restructuring**") that, among other things, delevers the Company's balance sheet and maximizes value for all of the Debtors' creditors.  As a result of extensive negotiations, on August 7, 2023, the Debtors executed a restructuring support agreement (the "**Restructuring Support Agreement**"), attached hereto as **Exhibit B**, with, among others, (i) DKB Partners LLC, in its capacity as administrative agent and lender under the Debtors' Credit Agreement, holding 100% of the Debtors' secured loans issued in accordance with the Credit Agreement, (ii) holders representing more than 85% of the aggregate principal amount of outstanding Unsecured Notes, and (iii) the Debtors' DIP Lenders under the DIP Term Sheet (the entities in the foregoing clauses (i), (ii) and (iii), collectively, the "**Consenting Creditors**"). Under the terms of the Restructuring Support Agreement, the Consenting Creditors agreed, subject to the terms and conditions of the Restructuring Support Agreement, to vote in favor of and support confirmation of a chapter 11 plan embodying the Restructuring Transactions set forth in the Restructuring Support Agreement.

The Restructuring is supported by nearly 90% of the Debtors' funded debt holders and is expected to reduce the Debtors' funded indebtedness by more than $480 million, enhance the Debtors' long-term growth prospects, and better position the Debtors to continue providing air cargo transportation services to their customers worldwide.

The Plan contemplates the consummation of "**Restructuring Transactions**" which generally provide for the following treatment for holders of Claims and Interests:

- Each holder of an Allowed DIP Claim will, on the Effective Date, in full satisfaction, settlement, release, and discharge of such Allowed DIP Claim, (i) have its Allowed DIP Claim exchanged, on a dollar-for-dollar basis, for new first lien secured convertible notes, which shall be convertible into approximately 58% of New Common Stock on the terms and subject to the conditions set forth in the New Convertible Notes Indenture (the "**New Convertible Notes**"), and also receive cash on account of fees or other charges payable through the Effective Date, or (ii) receive such other treatment agreed upon among the Debtors and the holders of Allowed DIP Claims.

---

[1] Capitalized terms used in this Disclosure Statement, but not defined herein, have the meanings ascribed to them in the Plan.  To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

- The holder of the Allowed Credit Facility Claims will receive, in full and final satisfaction of such Allowed Credit Facility Claims, 80.4% of the shares of New Common Stock that are issued and outstanding on the Effective Date, which will be subject to dilution by the New Common Stock (i) issuable upon exercise of the New Warrants, (ii) issuable upon conversion of the New Convertible Notes, and (iii) otherwise issued by Reorganized Western Global from time to time after the Effective Date in accordance with the Amended Organizational Documents.

- Each holder of an Allowed Unsecured Notes Claim will receive on the Effective Date, in full and final satisfaction, settlement, discharge, and release of such Allowed Unsecured Notes Claims, (i) if a DIP Buyout has not been consummated prior to the Effective Date, its Pro Rata share of the New Warrants, or (ii) if a DIP Buyout has been consummated prior to the Effective Date, its Pro Rata share of the Unsecured Notes Cash Pool.

- If the Class of holders of General Unsecured Claims vote to accept the Plan, each holder of an Allowed General Unsecured Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata share of the $2,000,000 General Unsecured Cash Pool. If the Class of holders of General Unsecured Claims vote to reject the Plan, each General Unsecured Claim will be discharged without further notice to, approval of or action by any Person or Entity, and each holder of a General Unsecured Claim shall not receive any distribution or retain any property on account of its General Unsecured Claim.[2]

- DKB Partners or an affiliate thereof will invest $11,000,000 in Reorganized Western Global in consideration for 19.6% of the New Common Stock that is issued and outstanding on the Effective Date, subject to dilution by, among other things, any New Common Stock (i) issuable upon exercise of the New Warrants, (ii) issuable upon conversion of the New Convertible Notes, and (iii) otherwise issued by Reorganized Western Global after the Effective Date (the "**New Equity Investment**").

Accomplishing an efficient and expeditious resolution of the Restructuring and the Chapter 11 Cases is essential to preserving and maximizing the going-concern value of the Debtors' Estates and successfully restructuring the Company. Accordingly, the Debtors intend to continue to prosecute their Chapter 11 Cases in a measured, efficient manner. The terms of the Debtors' postpetition financing arrangements reflect that intention, through the inclusion of appropriate milestones.

> **THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

## Summary of Plan Classification and Treatment of Claims and Interests

Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (a) the plan leaves unaltered the legal,

---

[2]   The Debtors may determine to add a convenience class to the Plan composed of holders of General Unsecured Claims below a specified amount and holders of General Unsecured Claims who have voluntarily agreed to reduce their Claim to such amount. The total distribution to holders of General Unsecured Claims designated to the convenience class (if added) will correspondingly reduce the amount of the General Unsecured Cash Pool.

equitable, and contractual rights to which such claim or interest entitles the holder thereof, or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Only Holders of Claims in Class 3 (Credit Facility Claims), Class 4 (Unsecured Notes Claims), and Class 5 (General Unsecured Claims) are being solicited under, and entitled to vote on, the Plan.

The following table summarizes the treatment of Claims and Interests under the Plan. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, see Article V—Summary of the Plan below.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unless a holder of an Allowed Priority Non-Tax Claim against any of the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the option of the Debtors or the Reorganized Debtors, as applicable, (i) each such holder shall receive payment in Cash in an amount equal to the amount of such Allowed Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, in each case, or as soon as reasonably practicable thereafter; or (ii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. | Unimpaired | No (Presumed to Accept) |
| 2 | Other Secured Claims | Unless a holder of an Allowed Other Secured Claim against any of the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, as applicable, (i) each such holder shall receive payment in Cash in an amount equal to the amount of such Allowed Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter; (ii) such holder's Allowed Other Secured Claim shall be Reinstated; (iii) such holder shall receive | Unimpaired | No (Presumed to Accept) |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan |
|---|---|---|---|---|
| | | the collateral securing its Allowed Other Secured Claim; or (iv) such holder shall receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. | | |
| 3 | Credit Facility Claims | On the Effective Date, each Allowed Credit Facility Claim will be released and extinguished, and the holder of the Allowed Credit Facility Claims shall receive, in full and final satisfaction of such Allowed Credit Facility Claims, 80.4% of the shares of New Common Stock that are issued and outstanding on the Effective Date, subject to dilution by the New Common Stock (i) issuable upon exercise of the New Warrants, (ii) issuable upon conversion of the New Convertible Notes, and (iii) otherwise issued by Reorganized Western Global from time to time after the Effective Date in accordance with the Amended Organizational Documents. | Impaired | Yes |
| 4 | Unsecured Notes Claims | Unless a holder of an Allowed Unsecured Notes Claim against any of the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, discharge, and release of such Allowed Unsecured Notes Claim, on the Effective Date, each holder of an Allowed Unsecured Notes Claim shall receive: (i) if a DIP Buyout has not been consummated prior to the Effective Date, its Pro Rata share of the New Warrants, or (ii) if a DIP Buyout has been consummated prior to the Effective Date, its Pro Rata share of the Unsecured Notes Cash Pool. In addition, for the benefit of the holders of Unsecured Notes and in lieu of any other exercise by the Unsecured Notes Indenture Trustee of its charging lien rights, the Debtors shall also pay the Unsecured Notes Indenture Trustee Fee and Expense Amount to the Unsecured Notes Indenture Trustee on the Effective Date. All distributions under Class 4 shall be made through the Unsecured Notes Indenture Trustee or with its written consent. | Impaired | Yes |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan |
|---|---|---|---|---|
| 5 | General Unsecured Claims | (i) <u>If and only if Class 5 Votes to Accept the Plan</u>:<br><br>On or as soon as reasonably practicable after the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata share of the General Unsecured Cash Pool.<br><br>(ii) <u>If and only if Class 5 Votes to Reject the Plan</u>:<br><br>On the Effective Date, each Allowed General Unsecured Claim will be discharged without further notice to, approval of or action by any Person or Entity, and each holder of an Allowed General Unsecured Claim shall not receive any distribution or retain any property on account of its General Unsecured Claim. | Impaired | Yes |
| 6 | Intercompany Claims | From and after the Effective Date, all Intercompany Claims shall be adjusted, continued, settled, Reinstated, discharged, contributed to capital, or eliminated, in each case to the extent determined to be appropriate by the Reorganized Debtors in their sole discretion. | Unimpaired | No (Presumed to Accept) |
| 7 | Intercompany Interests | From and after the Effective Date, all Intercompany Interests shall be adjusted, Reinstated, or cancelled, to the extent reasonably determined to be appropriate by the Reorganized Debtors in their sole discretion. | Unimpaired | No (Presumed to Accept) |
| 8 | Existing Equity Interests | On the Effective Date, all Existing Equity Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No holders of Existing Equity Interests will receive a distribution under the Plan. | Impaired | No (Deemed to Reject) |

The Debtors will inform holders of Credit Facility Claims, Unsecured Notes Claims, and General Unsecured Claims of the classification of their Claims through customized ballots mailed to such voting

creditors in such holder's solicitation package (the "**Solicitation Package**").[3]  After the Debtors mail the Solicitation Packages, they will not seek to modify the classification of any Credit Facility Claims, Unsecured Notes Claims, and General Unsecured Claims without notice to such holders.

**II.**
**OVERVIEW OF THE COMPANY'S OPERATIONS**

### A.    Company's Founding and Organizational Structure

As described in further detail in the *Declaration of Robert A. Del Genio in Support of Debtors' Chapter 11 Petitions and First-Day Pleadings* [Docket No. 23] (the "**First Day Declaration**"), the Company was founded in 2013 by James (Jim) K. Neff and began formal operations in 2014.  Western Global Airlines Holdings, Inc. ("**Holdings**"), a non-Debtor entity, directly or indirectly owns 100% of the equity or membership interests, as applicable, in all of the Debtors.  Sixty-two and one-half percent (62.5%) of the equity interests in Holdings are directly held by Jim Neff or Carmit (Sunny) Neff or owned by various trusts controlled by them (collectively, the "**Majority Shareholders**").  The remaining 37.5% of the equity interests in Holdings is owned by the trust established as part of the Western Global Employee Stock Ownership Plan (the "**ESOP**").  A chart setting forth the Debtors' corporate structure as of the Petition Date is attached hereto as **Exhibit C.**

### B.    Company's Business

#### i.    Assets and Operations

The Company is a Department of Transportation ("**DOT**") and Federal Aviation Administration ("**FAA**") certified, experienced provider of long-haul air cargo transportation services. The Company is headquartered in Estero, Florida, and maintains a global footprint, flying to over 400 cities and 135 countries since its formation.  In addition to its air cargo transportation business, the Company also operates a 160,000 square foot maintenance, repair and overhaul facility in Shreveport, Louisiana and a 20,000 square foot engine repair facility in Fort Myers, Florida that the Company uses to perform maintenance and checks on its aircraft and other equipment.  The Company also utilizes, as needed, 12 strategically located line maintenance service centers across the world.

For the first seven years of its existence, the Company, like many other airlines, did not own any of the freighter aircraft it operated or any of the engines.  The airline was party to leasing arrangements with two affiliates of the Majority Shareholders and it obtained ownership of the majority of the assets held as of the Petition Date solely as a result of the contribution of such assets by the Majority Shareholders to the Company in June of 2020, in order to support the funding of the ESOP.  As of the Petition Date, the Company owns and operates a fleet of large, wide-body cargo aircraft, which consists of 15 McDonnell Douglas MD-11Fs, three Boeing 747-400DCFs, and one Boeing 747-400F.  The Company owns all of the aircraft in its fleet, except for one Boeing 747-400F which is leased from an entity controlled by the Majority Shareholders.  To round-out its aircraft and equipment portfolio, the Company also owns 10 spare MD-11 airframes, two spare 747 airframes, 13 spare MD-11 engines, and five spare 747 engines.

The Company provides air cargo transportation services to its customers under aircraft, crew, maintenance, and insurance contracts ("**ACMI Contracts**") and full-service charter contracts, both of which can be long or short term in duration.  Pursuant to these contracts, the Company's business consists

---

[3]    The content of the Solicitation Package will be set forth in the Disclosure Statement Order.

9

of two primary lines of services: (i) governmental air cargo transportation services and (ii) commercial air cargo transportation services.

### ii.    Governmental Air Cargo Transportation Services

Through its governmental air cargo transportation services, the Company generates revenue through the fulfilment of missions as a Civil Reserve Air Fleet participant. The Civil Reserve Air Fleet is a program in which commercial air carriers pledge aircraft to the Department of Defense ("**DOD**") for times of national emergency in exchange for government airlift contracts in times of peace. The government places participants in the Civil Reserve Air Fleet into one or more "segments" based on the characteristics and capability of the participant's fleet. Civil Reserve Air Fleet participants typically form cooperative teams with other commercial air carriers to diversify fleet characteristics and capabilities and pool mobilization value points, which allows them to bid on government contracts more efficiently and effectively. The Company belongs to the "Patriot Team" as a Core Member. The number of missions awarded to the Patriot Team depends on the amount of mobilization value points credited to the team under its contract with the United States Transportation Command (the "**USTC**"), which directly corresponds to the total number and type of aircraft the Patriot Team has committed to the Civil Reserve Air Fleet program. Missions awarded to the Patriot Team under the USTC contract are allocated to individual team members in accordance with an allocation agreement among the Patriot Team members. The Company's participation in the Civil Reserve Air Fleet accounted for approximately 21.4% of its revenue for the twelve months ending on May 31, 2023.

### iii.    Commercial Air Cargo Transportation Services

Through its commercial air cargo transportation services, the Company contracts with some of the world's leading airlines, freight forwarders, logistics companies, e-commerce companies, and humanitarian organizations. Pursuant to ACMI Contracts, the Company provides its commercial customers with an aircraft and crew, and covers the cost of maintaining and insuring the aircraft, in exchange for a fee paid for each "block hour" of service provided to the customer. The Company also offers commercial services under full-service charter contracts, in which the Company provides its commercial customers with an aircraft and crew, and covers not only the cost of maintenance and insurance, but also all other necessary operating costs, including fuel, in exchange for an increased fee. Customers often prepay the Company for the services it renders under both ACMI Contracts and full-service charter contracts. The Company's commercial air cargo transportation services accounted for approximately 78.6% of its revenue for the twelve months ending on May 31, 2023.

### C.    <u>Regulation of the Company's Business</u>

The Debtors operate in a highly regulated and sophisticated industry. Following its founding, Western Global's predecessor, Western Global Airlines, LLC, received its DOT certification in February 2014 and its FAA approval for operating its MD-11F aircraft and its Boeing 747-400F aircraft in August 2014 and November 2015, respectively. In 2020, Western Global Airlines, LLC transitioned to a Delaware corporation from a Florida LLC and became Western Global Airlines, Inc. Western Global Airlines, LLC's FAA and DOT licenses were subsequently reissued to Western Global. Specifically, Western Global's FAA-121 certification authorizes it to operate as a regularly scheduled air cargo carrier in the U.S. and worldwide, and its DOT certificates of public convenience and necessity authorize Western Global to engage in (i) scheduled air transportation of property and mail between the United States and over 125 foreign countries, and (ii) charter air transportation of property and mail on a domestic and international basis. Western Global also holds DOT exemption authority that authorizes it to engage in scheduled air transportation of property and mail between the U.S., Hong Kong, and China, which is not included under the Company's DOT certificates.

### D.    Employee Workforce

As discussed in the First Day Declaration and *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Employee Obligations and (B) Maintain Employee Benefit Programs, and (II) Granting Related Relief* [Docket No. 9] (the "**Employee Benefits Motion**"), as of the Petition Date, the Debtors employ 291 full-time employees paid on a salaried basis and 61 employees paid on an hourly basis (collectively, the "**Employees**").  As of the Petition Date, the Debtors utilize the services of approximately 55 independent contractors, 10 of which are contracted out by third parties and 45 of which are contracted out and paid directly by the Debtors.

As described in more detail in the Employee Benefits Motion, in the ordinary course of business, the Debtors make various benefit plans available to their Employees, including a 401(k) retirement savings plan and the ESOP.  As part of the 401(k) Savings Plan, the Debtors match with cash contributions 50% of an Employee's 401(k) contributions up to 5% of the Employee's base salary.  The ESOP (which is unrelated to the 401(k) plan) became effective on June 6, 2020 and is administered by Western Global.  The ESOP is funded by a trust with respect to which an independent third party serves as trustee and ERISA fiduciary (the "**ESOP Trust**").  Through December 31, 2022, the ESOP Trust held approximately 85.6% of the 375,000 shares of Holdings in the ESOP loan suspense account, having allocated approximately 14.4% of stock to ESOP participant stock accounts since its formation.

The highly-regulated and sophisticated nature of the Debtors' business requires them to have a highly-skilled and experienced workforce.  At all levels, the Debtors' Employees and other service providers ensure, among other things, that the Debtors' day-to-day operations run safely and effectively.  The Employees and other service providers are critical to the Debtors' business and are essential for the Debtors to maximize the value of their Estates during and after these Chapter 11 Cases.  The Debtors' Employees are the bedrock of the company.  The Debtors intend to implement a workforce retention program (the "**Workforce Retention Program**") in furtherance of addressing the acute attrition issues the Debtors experienced this year and continue to experience, and to ensure that their key workforce remains in place to effectuate the Restructuring Transactions and implement their future business plan.  The Debtors intend to seek approval from the Bankruptcy Court to implement the Workforce Retention Program in the near-term.

The Debtors are not party to a collective bargaining agreement or similar labor agreement.  Prior to April 2021, there were no unions representing the Debtors' Employees.  However, on January 4, 2021, Air Line Pilots Association, International ("**ALPA**") invoked the services of the National Mediation Board to investigate and determine who may represent Western Global's pilots under the Railway Labor Act.  Following a vote conducted by the National Mediation Board, on April 6, 2021, ALPA was designated and authorized to represent Western Global's pilots.  As of the Petition Date, Western Global and ALPA were in the process of negotiating the terms of a collective bargaining agreement but had not yet reached an agreement.

### E.    Directors and Officers

Western Global's Board of Directors (the "**Board**") has three members, with Jim Neff serving as the Chairman of the Board.  On March 7, 2023, Western Global appointed a new independent director, Hooman Yazhari (the "**Independent Director**"), an industry and restructuring expert, to its Board to oversee the Company's restructuring process and evaluate and negotiate various strategic and value-maximizing alternatives.  Western Global's Board members are:

| Name | Position |
|---|---|
| James (Jim) Neff | Chairman |

| | |
|---|---|
| Carmit (Sunny) Neff | Director |
| Hooman Yazhari | Independent Director |

The following individuals are the officers of Western Global:

| Name | Position |
|---|---|
| James (Jim) Neff | President and CEO |
| Carmit (Sunny) Neff | Chief Innovation Officer |
| Marc Sullivan | CFO |
| Robert Del Genio | Co-Chief Restructuring Officer |
| Timothy McDonagh | Co-Chief Restructuring Officer |

**F.    Prepetition Indebtedness**

As of the Petition Date, the Debtors had outstanding funded debt obligations in the aggregate principal amount of approximately $560.6 million.  The Debtors' funded debt obligations are summarized below:

| Debt Instrument | Outstanding Principal ($ millions) |
|---|---|
| Credit Facilities | |
| *Revolving Credit Facility* | 47.5 |
| *Term Loan Facility* | 93.7 |
| Finance Leases | 1 |
| **Total Secured Debt** | **$    142.2** |
| Unsecured Notes | 400 |
| Subordinated Promissory Notes | 18.4 |
| **Total Funded Debt** | **$    560.6** |

This summary is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

**i.    Credit Facilities**

Western Global entered into that certain *Revolving Credit and Term Loan Agreement*, dated as of September 14, 2020 (as amended, restated, amended and restated, or supplemented from time to time, the "**Credit Agreement**" and the loans issued thereunder, the "**Secured Loans**"), by and among Western Global, as borrower, Western Global Airlines Holdings, Inc., as Holdings, Truist Bank, in its capacity as administrative agent ("**Truist**"), and the other lenders party thereto (collectively, the "**Initial Secured Lenders**"), pursuant to which the Initial Secured Lenders agreed to provide the Company with (i) a revolving credit facility in an aggregate principal amount equal to $47,500,000 (the "**Revolving Credit Facility**") and (ii) a term loan facility in an aggregate principal amount equal to $80,000,000 (the "**Term Loan Facility**" and together with the Revolving Credit Facility, the "**Credit Facilities**").

Holdings, Western Global, and each of its subsidiaries granted a security interest in all or substantially all of its assets to secure Western Global's obligations under the Credit Agreement.  In addition, 100% of the equity of Western Global and each of its subsidiaries was pledged to the Initial Secured Lenders to secure Western Global's obligations under the Credit Agreement.

On June 29, 2023, the Initial Secured Lenders sold the Secured Loans to DKB Partners LLC ("**DKB Partners**"), an affiliate controlled by the Majority Shareholders. Subsequent to the sale, the Company and DKB Partners entered into amendments to the Credit Agreement to provide for the funding of incremental senior bridge term loans in the aggregate principal amount of approximately $25,669,711.

The Revolving Credit Facility and the Term Loan Facility mature on February 15, 2025[4] and August 15, 2025,[5] respectively. As of the Petition Date, the aggregate principal amounts outstanding under the Revolving Credit Facility and the Term Loan Facility were approximately $47,500,000 and approximately $93,669,711, respectively.

      **ii.**      **Unsecured Notes**

Western Global issued senior unsecured notes in the aggregate principal amount of $400 million (the "**Unsecured Notes**" and the holders thereof, the "**Unsecured Noteholders**") pursuant to the terms and conditions of that certain *Indenture*, dated as of August 21, 2020 (as amended, restated, or supplemented from time to time, the "**Unsecured Notes Indenture**"), by and among Western Global, as issuer, the guarantors party thereto, and U.S. Bank Trust Company, National Association (as successor to U.S. Bank National Association), as trustee. The Unsecured Notes accrue interest at a rate of 10.375% and mature on August 15, 2025.

      **iii.**      **Subordinated Promissory Notes**

On June 16, 2020, two wholly owned subsidiaries of Western Global issued unsecured subordinated promissory notes (the "**Subordinated Notes**") to various trusts controlled by the Majority Shareholders in the aggregate principal amount of approximately $18.4 million. The Subordinated Notes accrue interest at a rate of 0.43%, annually, payable in-kind, and mature on June 15, 2027. The following table sets forth the issuer, holder and outstanding principal amount of the Subordinated Notes as of the Petition Date:

| Issuer of Subordinated Notes | Holder of Subordinated Notes | Outstanding Principal |
|---|---|---|
| JIMSUNN Air LLC | Carmit P. Neff Revocable Trust dated November 15, 2012 | $8,266,540.90 |
| JIMSUNN Air LLC | James K. Neff Revocable Trust dated November 15, 2012 | $8,266,540.90 |
| KELDANN Air LLC | Kelly S. Neff Trust dated January 1, 2010 | $949,143.44 |
| KELDANN Air LLC | Danielle J. Neff Trust dated January 1, 2010 | $949,143.44 |
| KELDANN Air LLC | James K. Neff and Carmit P. Neff | $1,900.43 |
| **Total Outstanding Principal** | | **$18,433,269.11** |

---

[4]    The Revolving Credit Facility is subject to a "Springing" maturity date on August 15, 2025 if certain conditions under the Credit Agreement are satisfied.

[5]    The Term Loan Facility is subject to a "Springing" maturity date on February 16, 2025 if certain conditions under the Credit Agreement are satisfied.

**III.**
**CIRCUMSTANCES LEADING TO COMMENCEMENT OF THESE CHAPTER 11 CASES**

**A.       Operational and Financial Challenges**

Prior to the COVID-19 pandemic, the Company had a track record of financial success in terms of growth, revenue generation, and earnings since operations began in 2014.  For example, in 2018, after only four years of operations, the Company's annual gross revenue was approximately $252 million and EBITDA was approximately $107 million.  Early in the pandemic, the Company's success was severely disrupted by reduced demand, governmental shutdowns, operational restrictions, and supply chain shortages.  Later on, the pandemic prompted an expansion of the e-commerce market and elimination of belly capacity on passenger airplanes, causing demand for airlines that specialize in air cargo transportation to spike.  These factors allowed the Company's revenue to grow substantially.  For the year 2020, the Company's annual gross revenue was approximately $373 million and EBITDA was approximately $197 million.  The Company's revenues continued to grow in 2021.

Based upon facts known at the time, the consensus among industry experts, consultants, bankers, and manufacturers was that, as a consequence of the significant disruptions to the logistics landscape and supply chains caused by over reliance on passenger airplanes to transport cargo, a structural shift from passenger airplane bellies to freighter aircraft had occurred for air cargo transportation.  These parties were of the view that the secular tailwinds propelling air cargo, including the rapid growth of e-commerce and increased demand for just-in-time delivery for critical goods, would continue sustainably and freighters would serve as the primary source of air cargo transportation going forward, causing a shortage of freighter aircraft for the foreseeable future.  This view was supported by a robust escalation of orders for new freighter aircraft, proliferation of new programs converting passenger aircraft to freighters, freighter aircraft orders by the major ocean shipping companies and passenger airlines, and long term contracts for dedicated freighter lift by forwarders who had previously relied primarily on passenger airplane bellies.  These factors, further reinforced by the Company's oversubscribed customer demand pipeline, led the Company to invest heavily in the expansion of its fleet and operational capabilities.  To this end, during 2020, 2021, and 2022, the Company purchased, conformed, and upgraded four additional freighters for its operations, acquired and overhauled engines for these airplanes, and ramped up its operational capabilities.

Despite these positive trends and enduring structural shifts in the air cargo industry, air cargo market demand softened significantly beginning in late 2022 because of the weakened global economy and other headwinds, which coincided with a resurgence of competing passenger belly capacity.  In the months leading up to the Petition Date, the Company, in particular, experienced a number of compounding operational and financial challenges caused by the unprecedented combination of unforeseeable negative macroeconomic and industry factors, including those set forth below.

**i.        Impacts of the COVID-19 Pandemic**

Although increasing gross revenues, the COVID-19 pandemic also resulted in an unforeseeable significant increase to the Company's costs and decrease in efficiency.  In particular, during the pandemic, the Company was regularly responsible for paying its crews hazard pay and overtime pay, the cost of parts and maintenance increased, and closures of borders and airports across the world required flights to be rerouted with costly extra stops.  In addition, because the Company's focus during this time was on long-term contracts with its customers, it did not benefit from the increased spot rates during the pandemic as much as certain other air cargo operators.

Many of the costs that soared during the COVID-19 pandemic did not descend when market rates in the air cargo industry decreased dramatically and demand abated due to a weakening global economy

and excess capacity. Rather, these costs escalated further due to unforeseeable events such as the rising inflation that followed the pandemic, the impact of the Russia-Ukraine conflict on fuel prices, and labor poaching from passenger airlines and other cargo airlines (discussed further below). For example, the Company's crews continued to expect hazard pay to compensate for the risks associated with flying to affected areas and the overtime pay that was offered when demand had soared. Additionally, maintenance facilities raised their rates further and prolonged lead times because of the significant rise in post-COVID demand from passenger airlines.

ii.      **2022-2023 COVID-19 Shutdown in China**

In 2019, the Company began developing a long-term strategy to provide air cargo services to various markets in mainland China, including Shanghai and Changsha, and other countries in East Asia. In connection with this strategy, the Company obtained several foreign air operating certificates that allowed it to fly transpacific routes, including CCAR-129 approval which allowed the Company to fly to China more frequently. By having greater access to the Chinese market, the Company was able to access a large and growing economy that exports a significant amount of goods to the United States each year. In addition, the transpacific routes allowed the Company to more efficiently utilize its fleet. Because of the longer distance associated with transpacific flights, the Company was able to sell a larger number of "block hours" for each flight between China and the Americas compared to a typical flight between countries and regions that are closer together. This allowed the Company to increase the revenue generated between scheduled maintenance for its aircraft, which is determined by the number of flight cycles (*i.e.*, operation from take-off to landing).

The Company's strategy to serve the Chinese market was successful at first; however, the abrupt nationwide shutdown in China at the end of 2022 and continuing into 2023 due to an unexpected resurgence of COVID-19 had an immediate and negative impact on the Company's performance. The shutdown abruptly halted exports from China and contributed to the decision by three major customers to suspend their long-term contracts despite ongoing contracted obligations to use the Company's services. Based on discussions with its customers and certain market predictions for the industry, the Company anticipated that China would reopen in February 2023, following the Chinese New Year; however, China did not reopen in that timeframe, which harmed the Company's performance in early 2023. While certain of the Company's customers in China have resumed flying, Chinese exports have still not returned to pre-pandemic levels. Furthermore, given the current state of the air cargo market, the Company's customers in China have demanded significantly lower rates that would cause the Company to fly for them at a loss. The Company also made large capital investments to support these long term contracts, the profitability of which has been significantly impacted by the recent shutdown in China. The trends in the Chinese market were consistent with the overall softening of air cargo demand globally; according to the International Air Transport Association (IATA), total international air cargo volumes declined relative to 2022 levels in each of the first five months of 2023, and have fallen below pre-COVID 2019 levels.

iii.     **Return of Belly Capacity on Passenger Flights**

Prior to the COVID-19 pandemic, approximately half of all air cargo volumes globally were carried on freighter aircraft, while the other half were transported in the bellies of passenger aircraft. The Company and other air cargo operators saw a significant uptick in demand due to the significant decrease in passenger flights during the COVID-19 pandemic. However, as travel restrictions were lifted and demand for passenger travel returned, belly capacity on passenger airlines returned to pre-pandemic levels. Contrary to their previous indications, several of the Company's customers began shifting more of their volumes to passenger airlines at the expense of traditional cargo airlines. Due to the sharp unanticipated drop in air cargo demand, certain of the Company's customers also cancelled contracts prematurely or sought price reductions to levels that were unsustainable for the Company.

### iv.    Russia-Ukraine War and Soaring Fuel Prices

The Russian-Ukrainian conflict, which has been ongoing since 2014, escalated in February 2022 when Russia launched a military incursion and invaded parts of Ukraine. Following Russia's invasion, President Biden, on March 8, 2022, signed an executive order banning imports of Russian oil, natural gas, and coal. The United Kingdom, the European Union, and several other countries followed suit shortly thereafter and announced their intention to limit the import of Russian oil. The economic sanctions and foreign policy directives issued by Western countries in response to Russia's invasion of Ukraine caused the price of fuel and other oil and gas products to skyrocket.[6] Thus, at the same time the Company was facing pricing pressure from its customers, the Company's fuel costs (and, therefore, operating expenses) were rising substantially. While the structure of the Company's customer contracts insulate it to a degree from the impacts of fuel price shifts, these large fuel price increases had a significant negative effect on profitability.

In addition to inflated fuel prices, the ban on overflight of Russian territory has also impacted air cargo shipments on routes from Asia to Europe and vice versa. The Company and many other air cargo operators have been forced to reroute their flights to avoid flying over Russian airspace, which results in extended flight times and increased costs.

### v.    Pilot and Mechanic Attrition

The air cargo industry has been plagued by the attrition of pilots, mechanics and corporate employees since the COVID-19 pandemic. During the early months of the pandemic, many passenger airlines prematurely retired their crews, allowing operators like the Company to attract a number of new flight crew members to operate its aircraft. The Company expended significant resources to retrain many of the new pilots to operate the MD-11 at its training center in Miami, Florida. However, following the pandemic, several of the major passenger airlines who lost employees to early retirement began soliciting pilots and other workers from the Company with signing bonuses, increased salaries and benefits, and reduced flight obligations. As a smaller independent cargo airline, the Company could not compete with major passenger airlines in terms of recruitment during this unprecedented hiring spree. As a result, the Company lost numerous pilots during 2022 and 2023 and has only been able to replace some of those lost. The high levels of pilot and mechanic attrition have prevented the Company from taking advantage of certain revenue-generating opportunities and also significantly increased costs related to the payment of overtime and the need to recruit and train new pilots.

### vi.    Third-Party Disputes

Prior to the Petition Date, the Company was engaged in a number of disputes over various matters with certain of its customers and vendors. In particular, in connection with an arbitration award rendered against Western Global and in favor of Trans-Caribbean Cargo Corporation ("**TCC**"), TCC recorded judgment liens against Western Global and filed, or sought to file, liens against certain of its property, including certain aircraft. All such liens were perfected in the 90 days prior to the Petition Date. Prepetition, TCC also engaged in enforcement actions and filed an *ex parte* motion for a post-judgment writ of garnishment against Western Global. The Writ of Garnishment was issued on June 29, 2023 and served on J.P. Morgan Chase Bank, N.A. ("**Chase**") and the Company on July 6, 2023. As a result of the Writ of Garnishment, the Debtors' primary bank account with Chase (the "**Primary Operating Account**") was

---

[6]    Notwithstanding Russia's invasion of Ukraine, oil prices were already reaching inflated levels due to higher demand stemming from the recovery of global economies from the COVID-19 pandemic and low investment in the oil and gas industry.

frozen for several weeks barring the Debtors' access to more than $7 million and significantly impacting the Debtors' liquidity runway and ability to continue to negotiate with stakeholders outside of chapter 11.

Following the Petition Date, the Debtors engaged in discussions with TCC's counsel regarding dissolving the Writ of Garnishment. An agreement was reached between the parties, and on August 11, 2023, TCC filed a stipulation to dissolve the Writ of Garnishment in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida Circuit Civil Division (the "**Florida Court**"). Upon the dissolution of the Writ of Garnishment, the Company obtained access to the funds held in the Primary Operating Account. On August 22, 2023, TCC filed that certain *Release of Judgment Liens* in the Florida Court. TCC is currently a member of the Creditors' Committee.

## B.   Restructuring Initiatives

The Company's pressing liquidity challenges, significant debt servicing obligations, and the unforeseeable and unyielding macro-industry challenges that began in late 2022, prompted the need for restructuring efforts to address the Company's liquidity position and secure the long-term viability of the business. As discussed in the First Day Declaration, in connection with these efforts, the Company commenced discussions with its various stakeholders regarding its situation and potential solutions. Such prepetition efforts included, among other things, entering into forbearance agreements with its senior secured lenders, a refinancing process for the senior secured loans, an asset sale process, and negotiations with an ad hoc group of over 85% of the Unsecured Noteholders and certain institutional investors (the "**Ad Hoc Group**") regarding the Restructuring Support Agreement and DIP Facility.

### i.   Secured Lender Engagement

#### a)   Forbearance Agreements

In response to certain defaults under the Credit Agreement, including the Company's failure to make an amortization payment due on September 30, 2022, and to address the treatment of $27 million of anticipated sale proceeds from a prospective sale of 16 unsuitable aircraft engines which were no longer needed for the Company's operations (collectively, the "**Unsuitable Engines**"), the Company entered into a forbearance agreement on December 2, 2022 with Truist, as administrative agent, and the Initial Secured Lenders (the "**First Forbearance Agreement**"). The First Forbearance Agreement expired according to its terms on December 16, 2022. Additionally, discussions with the potential buyer of the Unsuitable Engines terminated due to issues with the third party's financing and delays in obtaining an agreement from the Initial Secured Lenders to release their liens on the collateral. The Debtors continued their efforts to source liquidity by selling the engines, and in early 2023, began negotiations with a different third party for the purchase of the Unsuitable Engines and certain engine stands for $26 million (the "**Engine Sale**"), reflecting a $1 million reduction from the prior purchase price.

As market conditions continued to worsen in early 2023 without a foreseeable turnaround and the Company's liquidity failed to improve, it became evident that absent consummation of the Engine Sale or another source of immediate capital, the Company would be unable to continue to operate. The Initial Secured Lenders refused to provide incremental liquidity or allow the Company to access certain baskets under the Credit Facilities that would have permitted *pari* secured debt. Although the sale of the Unsuitable Engines was anticipated to close in early March 2023, the purchaser required a rigorous and lengthy inspection process that caused significant delays. Facing significant execution risks and no actionable solution to the dire liquidity issue, the Company sought assistance from the Majority Shareholders. With the consent of the Initial Secured Lenders, an affiliate of the Majority Shareholders served as an interim purchaser of the Unsuitable Engines on terms substantially the same as those the potential buyer was willing to transact on—without the conditionality and a number of less favorable (yet market) terms the Company

may otherwise have been bound to accept (the "**Affiliate Transaction**")[7].  The Independent Director evaluated the Affiliate Transaction[8] and determined that the Affiliate Transaction was negotiated on an arm's-length basis and that entry into the transaction was in the Company's best interests.  On April 10, 2023, the Board approved the Company's entry into the Affiliate Transaction and the Company closed on the Affiliate Transaction.

In parallel with negotiating the Affiliate Transaction, the Company engaged with Truist and the Initial Secured Lenders regarding a second forbearance agreement (the "**Second Forbearance Agreement**") to address certain existing and anticipated Events of Default under the Credit Agreement, including the Company's anticipated Events of Default with respect to paying the $4.5 million interest payment and the amortization payment due on March 31, 2023.  Under the Second Forbearance Agreement, the Initial Secured Lenders agreed to (a) consent to the sale of the Unsuitable Engines for the reduced purchase price of $26 million, (b) release their liens on the Unsuitable Engines to facilitate the Affiliate Transaction, and (c) allow the Company to retain 100% of the sale proceeds, subject to payment to Truist of $1,132,000 to reimburse fees and expenses incurred by Truist and fund a retainer for future fees and expenses of Truist.  The Second Forbearance Agreement was entered into on April 10, 2023 and, unless an earlier termination event occurred, Truist and the Initial Secured Lenders agreed to forbear from exercising any rights and remedies available under the Credit Agreement through May 31, 2023.

Following the expiration of the Second Forbearance Agreement, the Company executed that certain Third Forbearance Agreement, dated June 8, 2023, with Truist and the Initial Secured Lenders (the "**Third Forbearance Agreement**").  The Third Forbearance Agreement set forth certain milestones related to the Company's restructuring efforts and its contingency preparation for a potential chapter 11 filing.  The Third Forbearance Agreement addressed certain specified Events of Default and expired on July 15, 2023.

b)      **Refinancing Process and Sale of Secured Loans**

As required by the Initial Secured Lenders and in furtherance of the Company exploring its strategic restructuring options, in early May 2023, Evercore Group L.L.C ("**Evercore**"), on behalf of the Company, began outreach to a number of potential investors who, based on Evercore's experience and industry knowledge, have experience in the aviation industry or might otherwise be interested in refinancing all or a portion of the Credit Facilities.  Of the 52 parties that Evercore contacted, 30 parties executed a confidentiality agreement with the Company and obtained access to a virtual dataroom established for the financing process, which contained, among other documents, an initial business plan (the "**Initial Business Plan**") prepared by the Company with the assistance of its advisors.  Of the 30 parties that executed confidentiality agreements, four preliminary proposals were received by the Company and none turned out to be actionable.  In light of the results, the Initial Secured Lenders conveyed to the Company on a number of occasions that they believed that the only path forward for the Company was liquidation.  In furtherance of conducting a refinancing process outside of the Company's attempts, the Initial Secured Lenders conducted an independent and competitive auction during the week of June 12, 2023 for the sale of the Secured Loans, and invited the Majority Shareholders to submit a bid.

Notwithstanding the auction process conducted by the Initial Secured Lenders to sell their debt holdings, the Majority Shareholders provided the Company and Initial Secured Lenders with a proposal for

---

[7]     The Majority Shareholders subsequently sold the assets subject to the Engine Sale to the third party the Company was previously negotiating with; however, such sale closed at a $2 million loss to the Majority Shareholders for an aggregate purchase price of $24 million.

[8]     Both Jim Neff and Sunny Neff, who each serve on the Board, disclosed their interest in the Affiliate Transaction and recused themselves from the deliberation related to the Affiliate Transaction.

the purchase of substantially all of the Company's assets in a chapter 11 proceeding. The Majority Shareholders also submitted an alternative bid to purchase the Secured Loans. The Initial Secured Lenders rejected both bids and countered that a higher offer was needed to purchase the Secured Loans. In response to the Majority Shareholders' reluctance to proceed with the purchase of the Secured Loans, the Initial Secured Lenders informed the Company and DKB Partners that, absent the Majority Shareholders purchasing the Secured Loans, it would commence preparing the Company for a liquidation in 24 hours. Consequently, on June 29, 2023, the Initial Secured Lenders and DKB Partners entered into a Loan Sale and Assignment Agreement whereby DKB Partners purchased all of the outstanding Secured Loans from the Initial Secured Lenders for a purchase price of approximately $45 million.

### ii.    Asset Sale Process

In parallel to the Company's discussions with the Initial Secured Lenders, Evercore contacted a number of strategic investors and other parties who might be interested in purchasing the Debtors' aircraft and other assets. In addition, Evercore held discussions regarding DIP financing or an asset sale transaction with a number of parties that were involved in the prior process to refinance the Credit Facilities. In connection with the asset sale process, 18 new parties were contacted by Evercore, six of which executed confidentiality agreements with the Company and obtained access to the dataroom to facilitate their diligence efforts.

As a result of the asset sale and marketing process, the Company received two preliminary proposals, including stalking horse proposals from the Majority Shareholders and a third-party strategic investor. Based on the terms of the proposal received from the third-party strategic investor, any transaction with such investor would not have involved the continuation of the Company as a going concern. In addition, both proposals included a non-priming DIP, but subject to certain conditions that required consent of the Initial Senior Lenders. The Initial Senior Lenders remained unwilling to consent or otherwise agree to these DIP proposals for various reasons, and neither proposal ripened into an actionable transaction for the Debtors.

### iii.    Ad Hoc Group Engagement

In March 2023, the Ad Hoc Group organized and engaged Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul, Weiss**"), as counsel, and Ducera Partners LLC ("**Ducera**"), as investment banker. On May 16, 2023, the Company delivered the Initial Business Plan to Paul, Weiss and Ducera. On May 31, 2023, certain members of the Ad Hoc Group who executed confidentiality agreements with the Company received a copy of the Initial Business Plan as well. The Company's management team presented the Initial Business Plan to those members of the Ad Hoc Group on June 1, 2023. No restructuring proposal was submitted by the Ad Hoc Group or any individual member thereof following delivery and presentation of the Initial Business Plan.

Following DKB Partners' purchase of the Secured Loans, the Majority Shareholders began discussions with the Ad Hoc Group in response to their request to develop a modified plan that they would be willing to transact on. Extensive arms-length negotiations ensued and constructively progressed. On July 18, 2023, Western Global entered into a forbearance agreement (the "**Indenture Forbearance**") with certain members of the Ad Hoc Group because of its failure to deliver 2023 Q1 report and 2022 annual report, which were due May 15th and May 30th, respectively. The Debtors, the Ad Hoc Group, and DKB Partners subsequently reached an agreement as to the operative terms of a plan of reorganization and, on August 7, 2023 entered into a Restructuring Support Agreement. As further set forth in the business level term sheet attached to the Restructuring Support Agreement, the restructuring transactions include, among other things, (i) DKB Partners and certain members of the Ad Hoc Group sharing in the funding of a $75 million DIP facility, which will be converted, on a dollar for dollar basis, into the New Convertible Notes

on the Effective Date of the Debtors' chapter 11 plan, (ii) DKB Partners receiving 80.6% of the equity in Reorganized Western Global on account of the outstanding Secured Loans, (iii) the Unsecured Noteholders receiving 5-year transferrable warrants to purchase up to 7.5% of the equity in Reorganized Western Global struck at a $150 million enterprise value on account of the Unsecured Notes,[9] and (iv) DKB Partners investing $11 million of equity financing on the Effective Date in exchange for 19.6% of the equity in Reorganized Western Global.  The Restructuring Support Agreement further commits the parties thereto with respect to:

> ▪ Voting to accept a plan embodying the restructuring transaction described in the Restructuring Support Agreement;
>
> ▪ Agreeing to grant and not opt-out of the releases of third-party claims contemplated by the Plan;
>
> ▪ Refraining from taking any action that would delay or impede consummation of the Plan; and
>
> ▪ Supporting and effectuating the documentation within the timeframes contemplated in the Restructuring Support Agreement.

Additionally, the terms of the Plan described in the Restructuring Support Agreement indicate the intention of the Majority Shareholders and the Ad Hoc Group to provide some form of consideration to the ESOP Trust.

On August 7, 2023, the Debtors, DKB Partners, and certain members of the Ad Hoc Group reached an agreement on the terms of a DIP Facility in an aggregate principal amount of $75 million to provide the Debtors with the funds necessary to make key operating payments and prosecute the Chapter 11 Cases. The terms of the DIP financing are set forth in a binding term sheet executed by and among the parties.

## IV.
## THE CHAPTER 11 CASES

### A.    Commencement of Chapter 11 Cases

On August 7, 2023, the Debtors commenced the Chapter 11 Cases.  The Debtors are continuing to manage their properties and operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.    First-Day Motions

Following the commencement of the Chapter 11 Cases, the Debtors filed various motions (the "**First Day Motions**") seeking relief from the Bankruptcy Court to enable the Debtors to promote a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth reorganization through the Chapter 11 Cases and the Plan, and minimize any disruptions to the Debtors' operations.  After the first-day hearing, the Bankruptcy Court granted all of the interim relief requested in the First Day Motions and entered various interim orders authorizing the Debtors to, among other things:

---

[9]    As further set forth in the Restructuring Support Agreement and related term sheet, if DKB Partners exercises a purchase option to purchase all of the outstanding DIP Loans and DIP Commitments of the Funding Group DIP Lenders, holders of the Unsecured Notes will receive their pro rata share of a $17.5 million cash pool in lieu of the 5-year transferrable warrants.

- Pay certain prepetition taxes and assessments [Docket No. 63];

- Maintain and honor customer prepayments and credits [Docket No. 65];

- Continue insurance policies and surety bond program [Docket No. 66];

- Provide adequate assurance of payment to utility providers [Docket No. 67];

- Pay certain prepetition obligations for critical vendors, 503(b)(9) claimants, foreign vendors, and lienholders  [Docket No. 68];

- Continue paying employee wages and benefits [Docket No. 69];

- Continue the use of the Debtors' cash management system, bank accounts, and business forms [Docket No. 73]; and

- Obtain postpetition financing and use cash collateral [Docket No. 75].

The second-day hearing is scheduled for September 7, 2023.

C.    **DIP Financing and Cash Collateral**[10]

The Debtors entered chapter 11 with minimal cash on hand.  Access to DIP Financing and the use of Cash Collateral was critical to ensure that the Debtors had sufficient liquidity to operate their business and administer their Estates during the Chapter 11 Cases.  The Debtors ultimately selected a proposal for a $75,000,000 senior secured superpriority priming debtor-in-possession delayed draw term facility (the "**DIP Facility**"), which included a roll up of approximately $25.7 million of prepetition bridge financing provided by DKB Partners in the month leading up to the Petition Date.  The amounts under the DIP Facility are being funded in equal parts by DKB Partners, on one hand, and certain members of the Ad Hoc Group, on the other.  The Debtors, under the auspices of the Independent Director, negotiated the terms of the proposed DIP Facility with the DIP Lenders in good faith and at arm's-length.

As adequate protection for any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral, resulting from the Debtors' continued use thereof, the Debtors provided the Prepetition Secured Parties with, among other things, perfected junior security interests and replacement liens on Prepetition Collateral, Encumbered Collateral, and Unencumbered Collateral, including, subject to a final order approving the DIP Facility, Avoidance Action Proceeds.  In addition, the Debtors provided an adequate protection administrative expense claim to the Prepetition Secured Parties under section 507(b) of the Bankruptcy Code, subject and subordinate to certain other liens and DIP Obligations.

On August 8, 2023, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lender, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 75], approving on an interim basis, among other things, the Debtors' entry into the DIP Facility.

---

[10]    Capitalized terms used but not defined in this section have the meanings ascribed to such terms in the DIP Order.

As of August 28, 2023, the aggregate principal amount outstanding under the DIP Facility was approximately $62.9 million.

### D.        Retention of Chapter 11 Professionals

As of the date hereof, the Debtors have filed applications to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases. These professionals include: (i) Weil, Gotshal & Manges LLP as counsel [Docket No. 97]; (ii) Richards, Layton & Finger, P.A. as co-counsel [Docket No. 95]; (iii) Evercore Group L.L.C., as investment banker [Docket No. 94]; (iv) FTI Consulting, Inc., as financial and interim management and restructuring advisor [Docket No. 96]; and (v) Stretto, Inc. as claims and noticing agent and administrative advisor [Docket Nos. 70 and 93], respectively.

### E.        Appointment of Creditors' Committee

On August 21, 2023, an official committee of unsecured creditors (the "**Creditors' Committee**") was appointed by the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases [Docket Nos. 102 and 109]. The members of the Creditors' Committee are: (i) Trans-Caribbean Cargo Corporation, (ii) DBA Distribution Services, Inc., (iii) Unical Aviation, Inc, (iv) Lufthansa Tecknik AG, and (v) Aerotech Ops, LLC.

### F.        Statements and Schedules and Claims Bar Dates

On [●], 2023, the Debtors each filed their schedules of assets and liabilities and statements of financial affairs (the "**Schedules**") [Docket Nos. [●]]. On [●], 2023, the Bankruptcy Court entered an order approving, among other things, the deadlines for parties in interest to file proofs of claims in the Chapter 11 Cases (the "**Bar Date Order**") [Docket No. [●]]. Pursuant to the Bar Date Order, the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**General Bar Date**") expires on [●], 2023 at 5:00 p.m., prevailing Eastern Time, and the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**Governmental Bar Date**") expires on February 5, 2024, at 5:00 p.m., prevailing Eastern Time.

The applicable Bar Date will be extended to the later of (i) the General Bar Date or Governmental Bar Date, as applicable, and (ii) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days from the date on which: (a) the Debtors provide notice of an amendment or supplement to the Schedules for persons or entities affected by such amendment or supplement (the "**Amended Schedules Bar Date**"); and (b) the Debtors serve an order of the Bankruptcy Court authorizing rejection of any executory contract or unexpired lease of the Debtors for persons or entities asserting claims resulting from such rejection (the "**Rejection Damages Bar Date**").

### G.        Exclusivity

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Plan Period**"). In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.

The Exclusive Periods currently remain in effect—the Exclusive Plan Period and the Exclusive Solicitation Period are set to expire on December 5, 2023 and February 5, 2024, respectively. The Exclusive Periods may be extended by the Bankruptcy Court through no later than February 7, 2025 and April 7, 2025, respectively.

### H.    Investigation and Debtor Releases

In connection with the releases of the Released Parties (as defined in the Plan), proposed in Section 10.6(a) of the Plan, the Company authorized Weil to conduct an investigation of any transaction or events, which could give rise to claims held by the Debtors against the Majority Shareholders who are Released Parties under the Plan (the "**Investigation**").

The Investigation is being overseen by the Independent Director of the Western Global Board and has focused on evaluating claims that the Debtors may have against the Majority Shareholders, including, but not limited to, avoidance claims (as provided under chapter 5 of the Bankruptcy Code and applicable state law), ERISA breach of fiduciary duty claims, and state law fiduciary duty claims arising out of or in connection with the ESOP.

At the conclusion of the Investigation, Weil intends to inform Western Global's Board of the results of the Investigation, and the Company will determine if it is in the best interests of the Debtors and the Estates to release any and all claims against the Majority Shareholders and their Related Parties pursuant to the Plan. The Majority Shareholders are not involved in the Investigation. The Debtors' and their Estates' release of the Majority Shareholders currently contemplated by the Plan is consistent with the terms of the Restructuring Support Agreement and would be provided for valuable consideration, including, among other things, affiliates of the Majority Shareholders funding 50% of the DIP Loans and foregoing substantial statutory rights and consideration to which they are otherwise entitled as holders of the Credit Facility Claims and DIP Claims, as well as the additional $11 million New Equity Investment made by an affiliate of the Majority Shareholders, so that the holders of Unsecured Notes Claims and General Unsecured Claims will receive a distribution under the Plan. A final decision on the Debtors' position with respect to the release of the Majority Shareholders is anticipated to be made before the hearing to approve the Disclosure Statement.

**V.**
**SUMMARY OF PLAN**

This Section of the Disclosure Statement summarizes the Plan. This summary is qualified in its entirety by reference to the Plan.

### A.    Administrative Expense and Priority Claims

### i.    Administrative Expense Claims

Unless a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is three (3) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, unless otherwise required by a Final Order; provided, that, Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as the case may be, in the ordinary course of business, consistent with past practice and in accordance with

the terms and subject to the conditions of any course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.  The deadline to file requests for payment of Administrative Expense Claims, other than DIP Claims, Intercompany Claims, Fee Claims and Claims arising under section 503(b)(9) of the Bankruptcy Code, shall be established pursuant to the Confirmation Order.

        **ii.**       **Fee Claims**

        (a)       All Entities seeking an award by the Bankruptcy Court of Fee Claims shall file with the Bankruptcy Court, on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Effective Date.  Objections to any Fee Claims must be filed and served on counsel to the Reorganized Debtors, the U.S. Trustee, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors or the Reorganized Debtors, as applicable, and the party requesting compensation of a Fee Claim).

        (b)       Allowed Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) within five (5) calendar days of an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter, or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or the Reorganized Debtors, as applicable.  Notwithstanding the foregoing, any Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court, including the Interim Compensation Order, may be paid at the times and in the amounts authorized pursuant to such orders.

        (c)       No later than three (3) calendar days prior to the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services before the Effective Date to the Debtors and the Debtors and Reorganized Debtors, as applicable, shall separately escrow such estimated amounts in the Professional Fee Escrow Account for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties.  If a holder of a Fee Claim does not provide an estimate, the Debtors or Reorganized Debtors, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim.  When all such Allowed Fee Claims have been indefeasibly paid in full in Cash, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Reorganized Debtors without any further action or order of the Bankruptcy Court.

        (d)       Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims Allowed by the Bankruptcy Court have been indefeasibly paid in full in Cash. The Professional Fee Escrow Account and all funds therein shall be held in trust exclusively for Professionals and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been indefeasibly paid in full in Cash.

        (e)       The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

### iii.    Priority Tax Claims

Unless a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors or the Reorganized Debtors, as applicable:  (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due, or (b) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business or under applicable non-bankruptcy law as such obligations become due.

### iv.    DIP Claims

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Facility on such date; (ii) all interest accrued and unpaid thereon through and including the date of payment; and (iii) all accrued and unpaid fees, expenses, and indemnification obligations payable under the DIP Order and DIP Term Sheet.

Unless a holder of an Allowed DIP Claim agrees to less favorable treatment, each holder of an Allowed DIP Claim shall, on the Effective Date, in full satisfaction, settlement, release, and discharge of such Allowed DIP Claim, (a) have its Allowed DIP Claim exchanged, on a dollar-for-dollar basis, for New Convertible Notes and also receive cash on account of fees or other charges payable through the Effective Date, or (b) receive such other treatment agreed upon among the Debtors and the holders of Allowed DIP Claims.

### B.    Classification of Claims and Interests

### i.    Classification in General

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that, a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### ii.    Grouping of Debtors for Convenience Only

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making distributions in accordance with the Plan in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal Entity, result in substantive consolidation of any Estates, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any Assets.  Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

### iii.    Summary of Classification

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, Fee Claims and DIP Claims have not been classified. The classification of Claims and Interests set forth in the Plan shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth in the Plan.  Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 3.5 of the Plan.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 3 | Credit Facility Claims | Impaired | Yes |
| 4 | Unsecured Notes Claims | Impaired | Yes |
| 5 | General Unsecured Claims | Impaired | Yes |
| 6 | Intercompany Claims | Unimpaired | No (Presumed to Accept) |
| 7 | Intercompany Interests | Unimpaired | No (Presumed to Accept) |
| 8 | Existing Equity Interests | Impaired | No (Deemed to Reject) |

### iv.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### v.    Elimination of Vacant Classes

Any Class of Claims against or Interests in a Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one (1) holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan of such Debtor for purposes of voting to accept or reject such Debtor's Plan, and disregarded for purposes of determining whether such Debtor's Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### vi.    Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Debtor shall request that the Bankruptcy Court at the Confirmation Hearing deem the Plan accepted by the holders of such Claims in such Class.

vii.    **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

The Debtors shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Class of Claims or Interests that rejects or is deemed to reject the Plan. The Debtors reserve the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

C.    <u>**Treatment of Claims and Interests**</u>

i.    **Priority Non-Tax Claims (Class 1)**

a)    **Classification:** Class 1 consists of Priority Non-Tax Claims.

b)    **Treatment:** Unless a holder of an Allowed Priority Non-Tax Claim against any of the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the option of the Debtors or the Reorganized Debtors, as applicable, (i) each such holder shall receive payment in Cash in an amount equal to the amount of such Allowed Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, in each case, or as soon as reasonably practicable thereafter; or (ii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

c)    **Voting:** Class 1 is Unimpaired, and the holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Priority Non-Tax Claims.

ii.    **Other Secured Claims (Class 2)**

a)    **Classification:** Class 2 consists of the Other Secured Claims.

b)    **Treatment:** Unless a holder of an Allowed Other Secured Claim against any of the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, as applicable, (i) each such holder shall receive payment in Cash in an amount equal to the amount of such Allowed Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter; (ii) such holder's Allowed Other Secured Claim shall be Reinstated; (iii) such holder shall receive the collateral securing its Allowed Other Secured Claim; or (iv) such holder shall receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

c)    **Voting:** Class 2 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

iii.     **Credit Facility Claims (Class 3)**

a)     **Classification:**  Class 3 consists of Credit Facility Claims.

b)     **Allowance:**   To the extent not previously Allowed pursuant to the DIP Order, the Credit Facility Claims are Allowed in the aggregate amount of $115,500,000.00, plus fees, accrued and unpaid interest, charges, reimbursements, expenses, and other amounts arising and payable under and in accordance with the Credit Agreement, to the extent permitted by the Bankruptcy Code. Neither DKB Partners, as Credit Facility Administrative Agent, nor DKB Partners, as lender, shall be required to file Proofs of Claim on account of any Credit Facility Claim.  If the value of the Collateral securing the Credit Facility Claims is determined to be insufficient to fully satisfy the Credit Facility Claims, the amount attributable to the unsatisfied portion of the Credit Facility Claims shall constitute Credit Facility Deficiency Claims, which are classified in Class 5 (General Unsecured Claims).

c)     **Treatment:**  On the Effective Date, each Allowed Credit Facility Claim will be released and extinguished, and the holder of the Allowed Credit Facility Claims shall receive, in full and final satisfaction of such Allowed Credit Facility Claims, 80.4% of the shares of New Common Stock that are issued and outstanding on the Effective Date, subject to dilution by the New Common Stock (i) issuable upon exercise of the New Warrants, (ii) issuable upon conversion of the New Convertible Notes, and (iii) otherwise issued by Reorganized Western Global from time to time after the Effective Date in accordance with the Amended Organizational Documents.

d)     **Voting:**  Class 3 is Impaired, and the holder of the Credit Facility Claims in Class 3 is entitled to vote to accept or reject the Plan.

iv.     **Unsecured Notes Claims (Class 4)**

a)     **Classification:**  Class 4 consists of Unsecured Notes Claims.

b)     **Allowance:**  To the extent not previously Allowed pursuant to the DIP Order, the Unsecured Notes Claims are Allowed in the aggregate amount of $[●], plus the Unsecured Notes Indenture Trustee Fee and Expense Amount.  Neither the Unsecured Notes Indenture Trustee nor any holder of Unsecured Notes Claims shall be required to file Proofs of Claim on account of any Unsecured Notes Claim.

c)     **Treatment:**  Unless a holder of an Allowed Unsecured Notes Claim against any of the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, discharge, and release of such Allowed Unsecured Notes Claim, on the Effective Date, each holder of an Allowed Unsecured Notes Claim shall receive: (i) if a DIP Buyout has not been consummated prior to the Effective Date, its Pro Rata share of the New Warrants, or (ii) if a DIP Buyout has been consummated prior to the Effective Date, its Pro Rata share of the Unsecured Notes Cash Pool.  In addition, for the benefit of the holders of Unsecured Notes and in lieu of any other exercise by the Unsecured Notes Indenture Trustee of its charging lien rights, the Debtors shall also pay the Unsecured Notes Indenture Trustee Fee and Expense Amount to the Unsecured Notes Indenture Trustee on the Effective Date.  All distributions under Class 4 shall be made through the Unsecured Notes Indenture Trustee or with its written consent.

d)     **Voting:**  Class 4 is Impaired, and the holders of Unsecured Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

**v.      General Unsecured Claims (Class 5)**

    a)    **Classification:**  Class 5 consists of General Unsecured Claims.

    b)    **Treatment:**

        (i)    <u>**IF AND ONLY IF CLASS 5 VOTES TO ACCEPT THE PLAN**</u>**:**

On or as soon as reasonably practicable after the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata share of the General Unsecured Cash Pool.

**The foregoing is offered solely for settlement purposes as set forth in Article V of the Plan, and such settlement is conditioned on (i) Class 5 voting to accept the Plan, (ii) the Bankruptcy Court confirming the Plan, and (iii) the occurrence of the Effective Date.**

        (ii)    <u>**IF AND ONLY IF CLASS 5 VOTES TO REJECT THE PLAN**</u>**:**

On the Effective Date, each Allowed General Unsecured Claim will be discharged without further notice to, approval of or action by any Person or Entity, and each holder of an Allowed General Unsecured Claim shall not receive any distribution or retain any property on account of its General Unsecured Claim.

    (c)    **Voting:**  Class 5 is Impaired, and the holders of General Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan**.**

**vi.      Intercompany Claims (Class 6)**

    a)    **Classification:**  Class 6 consists of Intercompany Claims.

    b)    **Treatment:**  From and after the Effective Date, all Intercompany Claims shall be adjusted, continued, settled, Reinstated, discharged, contributed to capital, or eliminated, in each case to the extent determined to be appropriate by the Reorganized Debtors in their sole discretion.

    c)    **Voting:**  Class 6 is Unimpaired, and the holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

**vii.      Intercompany Interests (Class 7)**

    a)    **Classification:**  Class 7 consists of Intercompany Interests.

    b)    **Treatment:**  From and after the Effective Date, all Intercompany Interests shall be adjusted, Reinstated, or cancelled, to the extent reasonably determined to be appropriate by the Reorganized Debtors in their sole discretion.

c)    **Voting:** Class 7 is Unimpaired, and the holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

viii.    **Existing Equity Interests (Class 8)**

a)    **Classification:** Class 8 consists of Existing Equity Interests.

b)    **Treatment:** On the Effective Date, all Existing Equity Interests will be cancelled, released, and extinguished and will be of no further force and effect. No holders of Existing Equity Interests will receive a distribution under the Plan.

c)    **Voting:** Class 8 is Impaired, and the holders of Existing Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, as such holders will not receive or retain any property under the Plan on account of Existing Equity Interests. Therefore, holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Existing Equity Interests.

D.    <u>**Means for Implementation**</u>

i.    **Implementation**

On the Effective Date, the Restructuring Transactions will be implemented as follows, subject to modification as agreed to by the Debtors and the Required Creditors:

i.    all holders of Allowed Claims will receive the treatment provided under the Plan, and each of the Debtors will receive a discharge of all Claims to the fullest extent permitted by section 1141;

ii.    the Reorganized Debtors shall issue the New Common Stock;

iii.    in accordance with the New Investment Agreement, DKB Partners shall fund the New Equity Investment;

iv.    in accordance with the New Convertible Notes Indenture, the DIP Loans shall be exchanged for New Convertible Notes;

v.    in accordance with the New Warrant Agreement, the Reorganized Debtors shall issue the New Warrants; and

vi.    the Disbursing Agent (on behalf of the Debtors) shall make all distributions provided under the Plan to holders of Allowed Claims.

ii.    **No Substantive Consolidation**

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor. The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

### iii.     Sources of Consideration for Plan Distributions

The Reorganized Debtors shall fund distributions under the Plan with (i) Cash on hand, (ii) proceeds of the New Equity Investment, and (iii) the issuance of the New Convertible Notes, the New Common Stock, and the New Warrants.

### iv.     New Convertible Notes

(a)     On the Effective Date, the Reorganized Debtors shall issue the New Convertible Notes and provide any related guarantees, pursuant to and subject to the terms and conditions of the New Convertible Notes Indenture.

(b)     Confirmation shall be deemed approval of the issuance of the New Convertible Notes (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors shall be authorized to execute and deliver those documents necessary or appropriate to issue the New Convertible Notes and related guarantees without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors may deem to be necessary to consummate the issuance of the New Convertible Notes. The obligations incurred by the Reorganized Debtors pursuant to the New Convertible Notes shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the New Convertible Notes Indenture.

### v.     New Common Stock and New Warrants

(a)     The Reorganized Debtors are authorized to issue and distribute, and shall issue and distribute, the New Common Stock and New Warrants without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.  The New Common Stock and New Warrants shall each be issued and distributed free and clear of all Liens, claims, and other interests.  Notwithstanding the foregoing, in accordance with Section 4.4(a) of the Plan, no New Warrants will be distributed under the Plan if a DIP Buyout has been consummated prior to the Effective Date.

(b)     All of the New Common Stock and New Warrants issued and distributed pursuant to the Plan shall be duly authorized, validly issued, and, as applicable, fully paid, non-assessable, and assignable subject to the Shareholders Agreement.  Each distribution and issuance of the New Common Stock and New Warrants under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The New Warrants shall be assignable subject to the Shareholders Agreement.

(c)     Distributions to be made to holders of Unsecured Notes Claims shall be made to, or at the reasonable direction of, the Unsecured Notes Indenture Trustee, which shall transmit or direct the transmission of such distributions to holders of Unsecured Notes Claims, in accordance with the Unsecured Notes Indenture and the Plan.  The Unsecured Notes Indenture Trustee shall transfer or direct the transfer of such distributions through the facilities of The Depository Trust Company ("**DTC**") and the Unsecured Notes Indenture Trustee shall be entitled to recognize and deal for all purposes under the Plan with holders of the Unsecured Notes Claims to the extent consistent with the customary practices of DTC, and all

distributions to be made to holders of Unsecured Notes Claims shall be delivered to the Unsecured Notes Indenture Trustee in a form that is eligible to be distributed through the facilities of DTC.

(d)      The New Common Stock issued and distributed pursuant to the Plan provides for affiliates of DKB Partners to receive approximately 80.4% of shares of New Common Stock on account of Credit Facility Claims and approximately 19.6% of shares of New Common Stock on account of the New Equity Investment, prior to dilution resulting from any New Common Stock (i) issuable upon conversion of the New Convertible Notes, (ii) issuable upon exercise of the New Warrants, or (iii) that may be issued by Reorganized Western Global to the ESOP.

(e)      In accordance with the Restructuring Support Agreement, the New Common Stock issuable upon conversion of the New Convertible Notes will be structured to yield the following equity splits of New Common Stock on an as-converted basis, prior to any ratable dilution on account of the New Common Stock issuable upon exercise of the New Warrants or any New Common Stock that may be issued by Reorganized Western Global to the ESOP (i) approximately 71.0% held by DKB Partners and its affiliates and (ii) approximately 29.0% held by the Funding Group DIP Lenders.

### vi.      Shareholders Agreement and Amended Organizational Documents

Any Person's or Entity's acceptance of New Common Stock, New Warrants, or New Convertible Notes shall be deemed to constitute its agreement to be bound by the Shareholders Agreement and the Amended Organizational Documents, as the same may be amended, supplemented, or modified from time to time following the Effective Date in accordance with their terms.  The Shareholders Agreement and the Amended Organizational Documents shall be binding on all holders of the New Common Stock, New Warrants, and New Convertible Notes (in each case including their respective successors and assigns), whether such New Common Stock, New Warrants, or New Convertible Notes are received or to be received on or after the Effective Date and regardless of whether such holder executes or delivers a signature page to the Shareholders Agreement or the Amended Organizational Documents.    Notwithstanding the foregoing, Reorganized Western Global may condition the receipt of any New Common Stock issued or issuable pursuant to the Plan upon the receipt of duly executed counter-signature pages to the Shareholders Agreement.

### vii.      Compromise and Settlement of Claims, Interests, and Controversies

(a)      Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is, and shall be deemed, a good-faith compromise and settlement of all Claims, Interests, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan (the "**Plan Settlement**").  The Plan Settlement is the cornerstone of the Plan and is necessary to achieve a beneficial and efficient resolution of the chapter 11 cases for all parties in interest.

(b)      The compromises, settlements, and releases described in the Plan shall be deemed nonseverable from each other and from all other terms of the Plan.  The Bankruptcy Court's findings will constitute its determination that such compromises and settlements are: within the range of reasonableness; in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interest; and fair and equitable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

(c)     Pursuant to the compromises and settlements under the Plan and the releases granted in consideration thereof, the Secured Lender has agreed to permit holders of Allowed Unsecured Notes Claims and Allowed General Unsecured Claims (solely in the event that Class 5 votes to accept the Plan) to receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claims, the distributions set forth in Article IV of the Plan.  With respect to Class 5 and solely to the extent Class 5 votes to accept the Plan, the Secured Lender has consented to the General Unsecured Cash Pool, the value of which the Secured Lender would otherwise be entitled to receive as part of its recovery on account of its Credit Facility Claims pursuant to section 1129(b)(2) of the Bankruptcy Code.

### viii.     Restructuring Professional Fees

To the extent not already paid or reimbursed in connection with the DIP Facility, the Debtors or the Reorganized Debtors, as applicable, shall promptly pay outstanding and invoiced Restructuring Professional Fees as follows:  (a) on the Effective Date, reasonable Restructuring Professional Fees incurred during the period prior to the Effective Date to the extent invoiced to the Debtors at least two (2) days prior to the Effective Date; provided, that any Restructuring Professional Fees paid on the Effective Date shall be subject to the notice and review period requirements under the DIP Order, and subject to reimbursement if any such Restructuring Professional Fees are denied pursuant to a Final Order and to the procedures set forth in the DIP Order and (b) after the Effective Date, any unpaid Restructuring Professional Fees within ten (10) Business Days of receiving an invoice; provided, that, such Restructuring Professional Fees shall be paid in accordance with the terms of any applicable engagement letters or other contractual arrangements without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases.

### ix.     General Corporate Authority

(a)     Following the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, may take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, cancellation, sale, purchase, or liquidation in each case containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation in each case on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, cancellation, or dissolution pursuant to applicable state or federal law; (iv) the execution and delivery of the Definitive Documents; (v) the issuance of securities, all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule; (vi) such other transactions that are necessary or appropriate to implement the Plan in the most tax-efficient manner; and (vii) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or under the documents governing any indebtedness of the Debtors or the Reorganized Debtors, as applicable.

(b)     Each officer, member of the board of directors, or manager of the Debtors is, and each officer, member of the board of directors, or manager of the Reorganized Debtors shall be, authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including any action

33

by the stockholders or directors or managers of the Debtors or the Reorganized Debtors) except for those expressly required pursuant to the Plan.

       (c)       All matters provided for pursuant to the Plan involving the corporate structure of the Debtors or Reorganized Debtors, or any corporate, limited liability company, or related action required by the Debtors or Reorganized Debtors in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, board, or directors or managers of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors or Reorganized Debtors.

### x.      Continued Corporate Existence

       (a)       Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors, in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Organizational Documents. On or after the Effective Date, each Reorganized Debtor may take such action that may be necessary or appropriate as permitted by applicable law, instruments and agreements, and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate to effectuate the Plan, including, without limitation, causing: (i) a Reorganized Debtor to be merged or dissolved; (ii) a Reorganized Debtor to be converted to a limited liability company or other entity; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Chapter 11 Case on the Effective Date or any time thereafter.

### xi.      Authorization, Issuance, and Distribution of Interests

On the Effective Date, the holder of the Allowed Credit Facility Claims will receive New Common Stock which shall comprise 80.4% of the New Common Stock issued and outstanding on the Effective Date, subject to dilution by the New Common Stock (i) issuable upon exercise of the New Warrants, (ii) issuable upon conversion of the New Convertible Notes, and (iii) otherwise issued by Reorganized Western Global from time to time after the Effective Date in accordance with the Amended Organizational Documents.

### xii.      Section 1145 Exemption

       (a)       The offer, issuance, and distribution of the New Convertible Notes, New Common Stock, and New Warrants under Sections 2.4, 4.3, and 4.4 of the Plan, respectively, shall be exempt, to the fullest extent permitted pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Person, from registration under (i) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

       (b)       Under section 1145 of the Bankruptcy Code, any securities issued under the Plan that are exempt from such registration pursuant to section 1145(a) of the Bankruptcy Code will be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933, as amended; (ii) compliance with any rules and regulations of the U.S. Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (iii) the restrictions, if any, on the transferability of such securities and instruments, including any restrictions on the transferability under the terms of the Amended Organizational Documents and the Shareholders Agreement; and (iv) applicable regulatory approval.

(c)       The New Common Stock issued in respect of the New Equity Investment shall be exempt from registration under the Securities Act and any other applicable securities law pursuant to Section 4(a)(2) of the Securities Act and/or Regulation D thereunder.  Persons who receive the New Common Stock pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities" that may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.  Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Holders of such restricted securities would, however, under certain conditions, be permitted to resell New Common Stock without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A or any other registration exemption under the Securities Act, or if such sales of restricted securities are registered under the Securities Act.

(d)       All Persons and Entities shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock is exempt from registration.

(e)       Notwithstanding anything to the contrary in the Plan or otherwise, no Person or Entity may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock are exempt from registration or validly issued, fully paid, and non-assessable.

### xiii.       Cancellation of Existing Securities and Agreements

(a)       Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Debtors, on the Effective Date, all agreements, instruments, and other documents evidencing any prepetition Claim or Interest (other than Intercompany Interests that are not modified by the Plan) and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect against the Debtors or the Reorganized Debtors, as applicable, and the obligations of the Debtors or the Reorganized Debtors thereunder shall be deemed fully satisfied, released, and discharged.  The holders of or parties to such cancelled agreements, instruments, and other documents shall have no rights arising from or related to such agreements, instruments, and other documents or the cancellation thereof, except the rights provided for pursuant to the Plan.  For the avoidance of doubt, Section 5.13(a) of the Plan shall not apply to any security issued in connection with or pursuant to the Plan, including the New Common Stock, the New Convertible Notes, or the New Warrants.

(b)       Notwithstanding such cancellation and discharge of the Unsecured Notes Indenture and the releases contained in Article X of the Plan or in the Confirmation Order, and without limiting the extinguishment of the Debtors' obligations thereunder as of the Effective Date, the Unsecured Notes Indenture shall continue in effect after the Effective Date for the following limited purposes: (i) to govern the distribution of the New Warrants to be distributed pursuant to Class 4 by or at the direction of the Unsecured Notes Indenture Trustee, (ii) application of Unsecured Notes Indenture Trustee Fee and Expense Amount to the amounts owing to the Unsecured Notes Indenture Trustee by application of its charging lien and/or priority rights thereunder, and (iii) the preservation of all protections, immunities, exculpations and other rights of the Unsecured Notes Indenture Trustee as against the past and present holders of the Unsecured Notes.  All obligations of the Unsecured Notes Indenture Trustee other than to make distributions of Plan consideration received under the Plan are discharged as of the Effective Date and the Unsecured Notes Indenture Trustee shall have no further duties to the holders of Unsecured Notes or any kind.

(c)     Notwithstanding such cancellation and discharge and the releases contained in Article X of the Plan, the Credit Agreement and the DIP Term Sheet shall continue in effect solely to the extent necessary to (i) allow the holder of Allowed Credit Facility Claims and Allowed DIP Claims to receive distributions under the Plan; (ii) allow the Debtors, the Reorganized Debtors, the DIP Agent, the Credit Facility Administrative Agent, and the Disbursing Agent, as applicable, to make post-Effective Date distributions or take such other action pursuant to the Plan on account of the Allowed Credit Facility Claims and Allowed DIP Claims, as applicable, and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims in accordance with the Plan; and (iii) allow the Credit Facility Administrative Agent and the DIP Agent, as applicable, to enforce any obligations owed to them under the Plan (including seeking compensation and reimbursement for any reasonable and documented fees and expenses as provided in the Credit Agreement, the DIP Term Sheet, or the Plan); provided, that, nothing in Section 5.13 of the Plan shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.

(d)     Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in Section 5.13 of the Plan shall be deemed null and void and shall be of no force and effect.

(e)     Except for the foregoing, on and after the Effective Date, all duties and responsibilities of the Credit Facility Administrative Agent and the DIP Agent shall be fully discharged (i) unless otherwise specifically set forth in or provided for under the Plan, the Plan Supplement, or the Confirmation Order and (ii) except with respect to such other rights of the Credit Facility Administrative Agent and the DIP Agent that, pursuant to the Credit Agreement or the DIP Term Sheet and DIP Order, as applicable, survive the termination of such Credit Agreement or DIP Term Sheet and DIP Order, respectively.  Subsequent to the performance by the Credit Facility Administrative Agent or DIP Agent of its obligations pursuant to the Plan and Confirmation Order, such Credit Facility Administrative Agent or DIP Agent and each of their agents shall be relieved of all further duties and responsibilities related to the Credit Agreement or DIP Term Sheet and DIP Order, as applicable.

## xiv.     Officers and Boards of Directors

(a)     On the Effective Date, the board of directors of Reorganized Western Global shall consist of at least three (3) directors, which shall be selected by DKB Partners (or an affiliate thereof) in its sole discretion.  Each such director shall serve from and after the Effective Date pursuant to the terms of the Amended Organizational Documents and the other constituent documents of Reorganized Western Global.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement (or as a schedule or exhibit to the Disclosure Statement) the identity and affiliations of any person proposed to serve on the board of directors of Reorganized Western Global.  Prior to conversion of the New Convertible Notes to equity in accordance with the terms of the New Convertible Notes Indenture, the holders of the New Convertible Notes shall have the right to appoint one non-voting observer to the board of directors of Reorganized Western Global.

(b)     Except as otherwise provided in the Plan Supplement, the officers of the respective Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date and in accordance with the Plan and applicable non-bankruptcy law.  Except as otherwise provided in the Plan Supplement, the managing members for each of the Reorganized Debtors (other than Reorganized Western Global) immediately before the Effective Date shall continue to serve as the initial managing members of the respective Reorganized

Debtors on and after the Effective Date and in accordance with the Plan and applicable non-bankruptcy law.

(c)     Unless a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of the respective Reorganized Debtor on and after the Effective Date, the members of the board of directors or managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager will be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.

(d)     Commencing on the Effective Date, each of the directors and managers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable Amended Organizational Documents.

### xv.     Cancellation of Liens

Except as otherwise specifically provided in the Plan, including pursuant to Section 5.13 of the Plan, upon the Effective Date, any Lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

### xvi.     Employee Matters

Except as specifically indicated below, the Reorganized Debtors shall continue to honor all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, in accordance with section 1129(a)(13) of the Bankruptcy Code, and the obligations thereunder shall be paid in accordance with the terms thereof.

On the Effective Date, the Reorganized Debtors shall be deemed to have assumed the Employee Benefit Plans.  Notwithstanding anything contrary in the Employee Benefit Plans, the consummation of the Plan shall not be treated as a change in control or change of control or other similar transaction under the Employee Benefit Plans, if applicable.

On the Effective Date, all Existing Equity Interests, including the Existing Equity Interests held by Holdings, shall be cancelled, released, and extinguished and will be of no further force and effect.  Shareholders of Holdings, including the Majority Shareholders and the ESOP, will no longer have equity of any value on account of the Existing Equity Interests.  As of the Effective Date, any provision of an Employee Benefit Plan that provides for equity or equity-based compensation shall be deemed cancelled and shall be of no further force and effect, and any Employee Benefit Plan providing for such equity or equity-based compensation will be assumed in all respects other than with respect to such provisions, notwithstanding the continued existence of the ESOP for purposes of any future equity issuance to the ESOP by Reorganized Western Global.

The terms of the Plan described in the Restructuring Support Agreement indicate the intention of the Majority Shareholders and the Ad Hoc Group to provide some form of consideration to the ESOP.

      **xvii.**     **Closing of Chapter 11 Cases**

After an Estate has been fully administered, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

      **xviii.**    **Notice of Effective Date**

As soon as reasonably practicable following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

      **xix.**     **Separability**

Notwithstanding the combination of the separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

      **E.**      <u>**Distributions**</u>

      **i.**      **Distributions Generally**

Except as otherwise provided in the Plan, the Disbursing Agent shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

      **ii.**      **Distribution Record Date**

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests. The Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount. For the avoidance of doubt, the Distribution Record Date shall not apply to the Credit Facility Claims, the DIP Claims, or Unsecured Notes Claims, the holders of which shall receive a distribution in accordance with Article IV or Section 5.5 of the Plan, as applicable, on or as soon as practicable after the Effective Date.

      **iii.**     **Date of Distributions**

Except as otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as otherwise determined in accordance with the Plan, including the treatment provisions of Article IV of the Plan, or as soon as practicable thereafter; <u>provided</u>, <u>that</u>, the Reorganized Debtors may implement periodic distribution dates to the extent they reasonably determine them to be appropriate. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.

### iv.    Disbursing Agent

The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable fees and expenses incurred by the Disbursing Agent directly related to distributions hereunder shall be reimbursed by the Reorganized Debtors.  The Reorganized Debtors shall use commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims and Interests as of the Distribution Record Date, in each case, as set forth on the claims register.  The Reorganized Debtors shall cooperate in good faith with the Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.17 of the Plan.

### v.    Rights and Powers of Disbursing Agent

(a)    From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including holders of Claims against and Interests in the Debtors and other parties in interest, from any and all claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon the Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of the Disbursing Agent.  No holder of a Claim or Interest or other party in interest shall have or pursue any Claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making payments in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of the Disbursing Agent.

(b)    The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### vi.    No Postpetition Interest on Claims

Except as otherwise provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, interest shall not accrue or be paid on any Claims on or after the Petition Date; provided, that, other than with respect to any Claims entitled to interest under section 506(b) of the Bankruptcy Code, if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

### vii.    Delivery of Distributions

(a)    In the event that any distribution to any holder is returned as undeliverable, the Disbursing Agent shall review its books and records to determine if it possesses additional or different mailing addresses for such holder.  If, after such review, the Disbursing Agent is unable to locate a different or additional address for such holder, no further distributions shall be made to such holder unless and until such Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Except as set forth in Section 6.7(a) of the Plan, nothing in the Plan shall require the

Disbursing Agent to attempt to locate holders of undeliverable distributions and, if located, assist such holders in complying with Section 6.9 of the Plan.

(b)       No fractional amount of New Common Stock or New Warrants shall be distributed under the Plan.  When any distribution of New Common Stock or New Warrants would otherwise result in the issuance of a number of shares or securities that is not a whole number, the actual distribution of such shares or securities shall be rounded as follows: (i) fractions of one-half (½) or greater shall be rounded to the next higher whole number; and (ii) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares or securities with respect to the New Common Stock or New Warrants to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding provided in Section 6.7(b) of the Plan.

(c)       Section 6.7 of the Plan shall not apply to distributions to the holders of Unsecured Notes Claims.

### viii.    Distributions after Effective Date

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### ix.    Unclaimed Property

(a)       Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors or the Reorganized Debtors, as applicable, until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Debtors or the Reorganized Debtors, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one hundred and eighty (180) days from the date of distribution.  After such date, and notwithstanding Section 5.13 or any other provision of the Plan, all unclaimed property or interest in property shall revert to the Reorganized Debtors and the Claim of any other holder to such property or interest in property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Section 6.9 of the Plan shall not apply to distributions to the holders of Unsecured Notes Claims.

### x.    Time Bar to Cash Payments

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred eighty (180) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Requests for re-issuance of any check within one hundred eighty (180) days after issuance shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

### xi.    Manner of Payment under Plan

Except as otherwise specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, any Cash payment to be made pursuant to the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreement(s) or customary practices of the Debtors.

xii.    **Satisfaction of Claims**

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

xiii.    **Minimum Cash Distributions**

The Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; provided, that, if any distribution is not made pursuant to Section 6.13 of the Plan, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

xiv.    **Setoffs and Recoupments**

The Debtors and the Reorganized Debtors as applicable, may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable nonbankruptcy law; provided, that, neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by a Debtor or a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

xv.    **Allocation of Distributions between Principal and Interest**

Except as otherwise required by law (as reasonably determined by the Debtors or the Reorganized Debtors), distributions with respect to Allowed Claims shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

xvi.    **No Distribution in Excess of Amount of Allowed Claim**

Notwithstanding anything in the Plan to the contrary, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions under the Plan in excess of the Allowed amount of such Claim.

xvii.    **Withholding and Reporting Requirements**

(a)    *Withholding Rights*.    In connection with the Plan, any Person issuing any instrument or making any distribution contemplated by the Plan (or any other related agreement) or payment in connection therewith shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local or non-U.S. taxing authority, and notwithstanding any provision in the Plan to the contrary, any such Person shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including (i) liquidating all or a portion of any distribution or payment to be made under or in connection with the Plan (or any other related agreement) to generate sufficient funds to pay applicable withholding taxes, (ii) using its own funds to pay any applicable withholding taxes and retaining all or a portion of the applicable distribution, (iii) withholding distributions pending receipt of information necessary or appropriate to facilitate such distributions or until such holder has made arrangements reasonably satisfactory to the withholding agent or issuing or disbursing party for payment of any such tax obligations or (iv) establishing any other mechanisms it believes are reasonable

41

and appropriate. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan or payment in connection therewith shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other taxes, on account of such distribution. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. The withholding agent or issuing or distributing party may, pursuant to Section 6.18(b) of the Plan, require a holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan to complete and return an Internal Revenue Service ("**IRS**") Form W-8 or W-9, as applicable to each such holder, and any other applicable forms.

(b)     *Forms*. Any party entitled to receive Cash or other property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Debtors, Reorganized Debtors, Disbursing Agent or any such other issuing or distributing party (which Person shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate IRS Form W-9 or any applicable Form W-8, and any other forms or documents reasonably requested by the Debtors, Reorganized Debtors, Disbursing Agent or any other issuing or distributing party to reduce or eliminate any withholding required by any federal, state, or local taxing authority. If such request is made by the Debtors, the Reorganized Debtors, the Disbursing Agent, or such other designated Person, and such party fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

## F.     Procedures for Disputed Claims

### i.     Objections to Claims

The Debtors or Reorganized Debtors, as applicable, shall be entitled to object to Claims. After the Effective Date, only the Reorganized Debtors shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed. Any objections to Claims shall be served and filed on or before the Claims Objection Bar Date. The expiration of such period shall not limit or affect the Reorganized Debtors' rights to dispute Claims asserted other than through a Proof of Claim.

### ii.     Resolution of Disputed Administrative Expenses and Disputed Claims

On and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall have the authority to compromise, settle, withdraw, or otherwise resolve any objections to Claims without approval of the Bankruptcy Court, other than with respect to Fee Claims.

### iii.     Payments and Distributions with Respect to Disputed Claims

Notwithstanding anything in the Plan to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### iv.     Distributions after Allowance

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in the Plan, without interest, as provided in Section 7.9 of the Plan. Such distributions shall be made as soon as

practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

### v.    Disallowance of Claims

Unless otherwise agreed to by the Debtors or Reorganized Debtors, as applicable, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, as determined by a Final Order, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.  All Proofs of Claim filed on account of an indemnification obligation to a current or former director, manager, officer, or employee shall be deemed satisfied and expunged from the claims register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

### vi.    Estimation of Claims

The Debtors or the Reorganized Debtors, as applicable, may determine, resolve, and otherwise adjudicate all contingent Claims, unliquidated Claims, and Disputed Claims in the Bankruptcy Court.  The Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent Claim, unliquidated Claim, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason or purpose.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent Claim, unliquidated Claim, or Disputed Claim, that estimated amount shall constitute the maximum limitation on such Claim, and the Debtors or the Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the ultimate allowance of such Claim; provided, that, such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

### vii.    No Distributions Pending Allowance

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### viii.    Claim Resolution Procedures Cumulative

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### ix.    Interest

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date.

### G.    Executory Contracts and Unexpired Leases

#### i.    General Treatment

(a)    As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Effective Date; or (iv) is specifically designated as a contract or lease to be assumed on the Assumption Schedule.

(b)    Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, including assignments to another Debtor, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment, or applicable law.

#### ii.    Determination of Cure Disputes and Deemed Consent

(a)    Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on or as soon as reasonably practicable after the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.

(b)    The Debtors shall file, as part of the Plan Supplement, the Assumption Schedule. At least fourteen (14) days before the commencement of the Confirmation Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed reflecting the Debtors' intention to assume the contract or lease in connection with the Plan and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court**. Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Amount (i) shall be deemed to have assented to such assumption, assumption and assignment, or Cure Amount, notwithstanding any provision thereof that purports to (1) prohibit, restrict, or condition the transfer or assignment of such contract or lease or (2) terminate or permit the termination of a contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminating or modifying such contract or lease on account of transactions contemplated by the Plan and (ii) shall be forever barred, estopped, and enjoined from challenging the validity of such assumption or assumption and assignment, as applicable, thereafter.

(c)    If there is an Assumption Dispute (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to the assumption being effective; provided, that, the Debtors or the Reorganized Debtors may settle any Assumption Dispute without any further notice to, or action by, any party or order of the Bankruptcy Court.

(d)      To the extent an Assumption Dispute relates to Cure Amounts, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of such Assumption Dispute; provided, that, the Debtors or the Reorganized Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the Cure Amount by the counterparty to such executory contract or unexpired lease.

(e)      Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease.  Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

### iii.      Rejection Damages Claims

In the event that the rejection of an executory contract or unexpired lease pursuant to the Plan results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor, or their respective properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor and the Reorganized Debtor no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of rejection of such executory contract or unexpired lease.  Any such Claims, to the extent Allowed, shall be classified as General Unsecured Claims.

### iv.      Indemnification Obligations

Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise.  Each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose (whether before or after the Petition Date).

### v.      Insurance Policies

Notwithstanding any other provision in the Plan, all insurance policies to which any Debtor is a party as of the Effective Date (including any "tail policy") shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Reorganized Debtors and shall continue as obligations of the Debtors or Reorganized Debtors in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors, as applicable, without the necessity for further approvals or orders.  Nothing in the Plan shall alter, modify, amend, affect, impair, or prejudice the legal, equitable, or contractual rights, obligations, and defenses of the Debtors or the Reorganized Debtors or any other individual or entity, as applicable, under (or affect the coverage under) the Debtors' insurance policies.

### vi.      Intellectual Property Licenses and Agreements

Notwithstanding any other provision in the Plan, all intellectual property contracts, licenses, royalties, or other similar agreements, if any, to which the Debtors have any rights or obligations in effect

45

as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors. Unless otherwise noted in the Plan, as applicable, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated in the Plan.

## vii. Assignment

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

## viii. Reservation of Rights

(a)     The Debtors may amend the Assumption Schedule until the Effective Date in order to add, delete, or reclassify any executory contract or unexpired lease. The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

(b)     Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors have any liability thereunder.

(c)     Except as explicitly provided in the Plan, nothing therein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(d)     Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

## ix. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and executory contracts and unexpired leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

46

**H.**    **Conditions Precedent to Confirmation of Plan and Effective Date**

**i.**    **Conditions Precedent to Confirmation of Plan**

The following are conditions precedent to confirmation of the Plan:

(a)    the Disclosure Statement Order shall have been entered; and

(b)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed.

**ii.**    **Conditions Precedent to Effective Date**

The following are conditions precedent to the Effective Date of the Plan:

(a)    the Restructuring Support Agreement shall be in full force and effect;

(b)    each document or agreement constituting the applicable Definitive Documents shall (i) be in form and substance consistent with the Restructuring Support Agreement (including, without limitation, the consent rights set forth therein), (ii) have been duly executed, delivered, acknowledged, filed, and/or effectuated, as applicable, and (iii) be in full force and effect, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived in accordance with the terms thereof;

(c)    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to consummate the Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

(d)    the Amended Organizational Documents shall have been executed, delivered, acknowledged, filed, and/or effectuated, as applicable, and be in full force and effect;

(e)    all Fee Claims shall have been paid in full or amounts sufficient to pay such Fee Claims in full after the Effective Date shall have been placed in the Professional Fee Escrow Account;

(f)    all Restructuring Professional Fees shall have been paid in full in accordance with the terms of the Plan;

(g)    the Disclosure Statement Order shall constitute a Final Order;

(h)    the Confirmation Order shall constitute a Final Order;

(i)    the New Equity Investment shall have been funded in accordance with the New Investment Agreement; and

(j)    Holdings shall have granted a release to the Released Parties on terms consistent with those releases being granted under Section 10.6(b) of the Plan.

The conditions to the Effective Date of the Plan set forth in Section 9.2 of the Plan may be waived only by the Debtors, with the consent of the Required Creditors, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules; provided, that, such conditions may be waived only by the Debtors, with the consent of DKB Partners (or a successor or affiliate thereof), and,

solely with respect to the conditions set forth in Section 9.2(a), (f), (g), and (h) of the Plan, the Required Holders, in the event that a DIP Buyout is consummated.

### iii.    Waiver of Stay of Confirmation Order

The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### iv.    Effect of Non-Occurrence of Conditions to the Effective Date

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtor, any holders of a Claim or Interest or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of a Claim or Interest, or any other Entity in any respect.

## I.    Effect of Confirmation of Plan

### i.    Vesting of Assets

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan or the Confirmation Order.  On and after the Effective Date, the Reorganized Debtors may take any action, including the operation of their business, the use, acquisition, sale, lease, and disposition of property, and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as expressly provided in the Plan.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### ii.    Binding Effect

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders (a) were Impaired or Unimpaired under the Plan; (b) were deemed to accept or reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) received any distribution under the Plan.

### iii.    Discharge of Claims and Termination of Interests

Upon the Effective Date, and in consideration of the distributions to be made pursuant to the Plan, except as otherwise expressly provided therein, any and all Claims, Interests, rights, and liabilities against the Debtors that arose prior to the Effective Date shall be discharged to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Upon the Effective Date, the holders of any such Claims, Interests, rights, and liabilities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim, Interest, right, or liability against the Debtors or the Reorganized Debtors or any of their Assets or property, whether or not such holder has filed

a Proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

### iv.    Term of Injunctions or Stays

Unless otherwise provided in the Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### v.    Injunction

(a)    Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim or Interest extinguished, discharged, released or treated pursuant to the Plan.

(b)    Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in any or all of the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, released, or treated pursuant to the Plan, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties; (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or allowed by the Plan, or to the extent asserted with respect to a timely Proof of Claim or an objection to the confirmation of the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)    The injunctions in Section 10.5 of the Plan shall extend to any successors of the Debtors or the Reorganized Debtors and their respective property and interests in property.

### vi.    Releases

a)    **Releases by the Debtors**

**As of the Effective Date, except for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remains in effect after the Effective Date, for good and valuable consideration, on and after the Effective Date, the Released Parties shall be deemed released**

and discharged by the Debtors, the Estates, the Reorganized Debtors, and any Person seeking to exercise the rights of the Estates, and any successors to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, from any and all claims, obligations, rights, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereinafter arising, in law, equity or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Estates, or the Reorganized Debtors, that the Debtors, the Estates, or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' business, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the Restructuring Transactions, or any other transaction involving the restructuring of Claims or Interests before or during the Chapter 11 Cases, the Disclosure Statement, the Plan, and the Definitive Documents, the DIP Facility, the Restructuring Support Agreement, the New Convertible Notes, the New Common Stock, the New Warrants, the Credit Agreement, the Unsecured Notes Indenture, the Amended Organizational Documents, the Shareholders Agreement, or any related agreements, instruments, or other documents, and the negotiation, formulation, or preparation of any of the foregoing, the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, that, the foregoing shall not release any Cause of Action arising from an act or omission determined by Final Order to constitute gross negligence, willful misconduct, or intentional fraud.

b)   <strong>Releases by Certain Holders of Claims and Interests</strong>

As of the Effective Date, except for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remains in effect after the Effective Date, for good and valuable consideration, on and after the Effective Date, the Releasing Parties conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release (and each entity so discharged and released shall be deemed discharged and released by the Releasing Parties) the Released Parties and their respective property from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereinafter arising, in law, equity or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors or the Reorganized Debtors or the Estates, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the Restructuring Transactions, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party (other than assumed contracts or leases), any other transaction involving the restructuring of Claims or Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation or consummation of the Plan (including the Plan Supplement), the Definitive Documents, the DIP Facility, the Restructuring Support Agreement, the New Convertible Notes, the New Common Stock, the New Warrants, the Credit Agreement, the Unsecured Notes Indenture, the Amended Organizational Documents, the Shareholders Agreement, or any related agreements, instruments or other documents, and the negotiation, formulation, or preparation of any of the foregoing, or the solicitation of votes with respect to the Plan, in all cases

based upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that, the foregoing shall not release any Cause of Action arising from an act or omission determined by Final Order to constitute gross negligence, willful misconduct, or intentional fraud.

> vii.    **Exculpation**

**Notwithstanding anything in the Plan to the contrary, and to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for any claim arising between the Petition Date and the Effective Date based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the DIP Facility, the Restructuring Support Agreement, the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring Transactions, the New Convertible Notes, the New Common Stock, the New Warrants, the Credit Agreement, the Unsecured Notes Indenture, the Amended Organizational Documents, the Shareholders Agreement, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, the pursuit of consummation of the Effective Date, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or prior to the Effective Date related or relating to the foregoing, except for acts or omissions determined by Final Order to constitute gross negligence, willful misconduct, or intentional fraud, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.**

> viii.    **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

> ix.    **Retention of Causes of Action/Reservation of Rights**

Except as otherwise provided in Sections 10.5, 10.6, and 10.7 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including any affirmative Causes of Action against parties with a relationship with the Debtors.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses notwithstanding the occurrence of the Effective Date, and all of the Debtors'

legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

      **x.**      **Solicitation of Plan**

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

      **xi.**      **Corporate and Limited Liability Company Action**

Upon the Effective Date, all actions of the Debtors or Reorganized Debtors, as applicable, contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) those set forth in Section 5.9 of the Plan; (b) the selection of the managers, directors, and officers for the Reorganized Debtors; (c) the distribution, transfer, or issuance of the New Common Stock; (d) the entry into the New Convertible Notes Indenture and the issuance of the New Convertible Notes thereunder; (e) the entry into the New Investment Agreement; (f) the entry into the New Warrant Agreement and the issuance of the New Warrants thereunder; and (g) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case, in accordance with and subject to the terms hereof.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments, certificates of merger, certificates of conversion, certificates of incorporation, or comparable documents, or franchise tax reports contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, (i) the Amended Organizational Documents; (ii) the Shareholders Agreement; (iii) the New Convertible Notes Indenture; (iv) the New Investment Agreement; (v) the New Warrant Agreement; and (vi) any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Section 10.11 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

      **J.**      **Retention of Jurisdiction**

      **i.**      **Retention of Jurisdiction**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)     to hear and determine motions and/or applications for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases, including disputes over Cure Amounts, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)     to hear and determine disputes in connection with the rights of any Debtors arising out of, or resulting from, these Chapter 11 Cases, including with respect to any impact of these Chapter 11 Cases on the property or contract rights of the Debtors;

(c)     to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced in the Chapter 11 Cases after the Confirmation Date;

(d)     to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(e)     to consider the allowance, disallowance, classification, priority, compromise, cancellation, estimation, or payment of any Claim or Interest;

(f)     to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)     to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)     to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     to hear and determine all Fee Claims;

(j)     to adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, or the Confirmation Order or any agreement, instrument, or other document governing or relating to any of the foregoing; provided, that, any dispute arising after the Effective Date under or with respect to the New Convertible Notes Indenture, the New Investment Agreement, the New Warrant Agreement, the Amended Organizational Documents, the Shareholders Agreement, or any other documents entered into by the Reorganized Debtors shall be adjudicated in accordance with the terms of such documents;

(l)     to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)     to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including the releases, discharge, exculpations, and injunctions issued thereunder;

(p)     to resolve disputes concerning Disputed Claims or the administration thereof;

(q)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(r)     to enter one or more final decrees closing the Chapter 11 Cases;

(s)     to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(t)     to resolve disputes as to the ownership of any Claim or Interest;

(u)     to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located;

(v)     to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(w)     to hear and determine any rights, claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(x)     to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code.

### ii.     Courts of Competent Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### K.     Miscellaneous Provisions

### i.     Payment of Statutory Fees

On the Effective Date and thereafter as may be required, the Debtors or the Reorganized Debtors, as applicable, shall pay all Statutory Fees that are due and payable.  After the Effective Date, the Reorganized Debtors shall pay any and all Statutory Fees when due and payable.  The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-

MOR.  After the Effective Date, the Reorganized Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  Notwithstanding anything in the Plan to the contrary, the Debtors or the Reorganized Debtors, as applicable, shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee and file such reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  The obligations under Section 12.1 of the Plan shall remain for each Debtor until such time as a final decree is entered closing the Chapter 11 Case for such Debtor, a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's Chapter 11 Case is entered.

### ii.    Substantial Consummation of the Plan

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### iii.    Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; provided, that, following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes:  (a) Claims and/or applications, and any relief related thereto, for compensation by professional persons retained in the Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (b) any appeals of the Confirmation Order or other appeals to which the Creditors' Committee is a party.

### iv.    Plan Supplement

The Plan Supplement shall be filed with the Bankruptcy Court not later than seven (7) calendar days prior to the earlier of the Voting Deadline and the Plan Objection Deadline.  Upon its filing with the Bankruptcy Court, the documents included in the Plan Supplement shall be posted at the website of the Debtors' notice, claims, and solicitation agent.

### v.    Request for Expedited Determination of Taxes

The Debtors and Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Debtors filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### vi.    Exemption from Certain Transfer Taxes

Pursuant to and to the fullest extent permitted by section 1146 of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments or documents; (ii) the creation, filing or recording of any Lien, mortgage, deed of trust or other security interest; (iii) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated (directly or indirectly) under the Plan pursuant to a Restructuring Transaction; (iv) the making, assignment filing or recording of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the

reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise); and (v) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any stamp tax or similar tax, including document recording tax, conveyance fee, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing, or recording fee, sales tax, use tax or other similar tax, or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

### vii.   Amendments

(a)   The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code.  After entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend, modify, or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.

(b)   Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement to cure any non-substantive ambiguity, defect (including any technical defect), or inconsistency without further order or approval of the Bankruptcy Court.

### viii.   Effectuating Documents and Further Transactions

Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable board of directors or managers (on terms materially consistent with the Plan), to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, which shall be in form and substance reasonably satisfactory to the Debtors.

### ix.   Revocation or Withdrawal of the Plan

The Debtors may revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing of or limiting to an amount of any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Entity; (ii) prejudice in any manner the rights of such Debtor or any other Entity; or (iii) constitute an admission of any sort by any Debtor or any other Entity.

x.      **Severability of Plan Provisions**

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or Reorganized Debtors, as applicable; and (c) nonseverable and mutually dependent.

xi.     **Governing Law**

Unless the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

xii.    **Time**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth therein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

xiii.   **Dates of Actions to Implement the Plan**

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

xiv.    **Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), the Released Parties, the Exculpated Parties and each of their respective successors and assigns, including the Reorganized Debtors.

xv.     **Deemed Acts**

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

xvi.    **Successor and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

xvii.    **Entire Agreement**

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

xviii.    **Exhibits to Plan**

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full therein.

xix.    **Notices**

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by electronic mail or facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)    if to the Debtors or the Reorganized Debtors:

Western Global Airlines, Inc.
9260 Estero Park Commons Blvd.
Suite 200
Estero, FL 33928
Attn:    Robert Del Genio, Tim McDonagh, and Marc Sullivan
Email:    robert.delgenio@fticonsulting.com
        tim.mcdonagh@fticonsulting.com
        marc.sullivan@westernglobal.aero

– and –

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:    Gary T. Holtzer, Esq., Candace M. Arthur, Esq.,
        and Jason H. George, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  gary.holtzer@weil.com
        candace.arthur@weil.com
        jason.george@weil.com

– and –

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn:    Mark D. Collins, Esq., Zachary I. Shapiro, Esq.,
   and Amanda R. Steele, Esq.
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Email:  collins@rlf.com
   shapiro@rlf.com
   steele@rlf.com

(b)  if to a member of the Ad Hoc Group:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:    Alice Belisle Eaton, Esq., Sean A. Mitchell, Esq.,
   Douglas R. Keeton, Esq., and Kyle R. Satterfield, Esq.
Email:  aeaton@paulweiss.com
   smitchell@paulweiss.com
   dkeeton@paulweiss.com
   ksatterfield@paulweiss.com

– and –

Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Attn:    Richard S. Cobb, Esq
   Nicolas E. Jenner
Email:  cobb@lrclaw.com
   jenner@lrclaw.com

(c)  if to the Secured Lender or DKB Partners, in its capacity as a DIP Lender:

Young Conaway Stargatt & Taylor, LLP
Rodney Square, 1000 North King Street
Wilmington, DE 19801
Attn:    Pauline Morgan, Esq., Craig D. Grear, Esq., and Sean Greecher, Esq.
Email:  pmorgan@ycst.com
   cgrear@ycst.com
   sgreecher@ycst.com

After the Effective Date, the Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors and Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

## VI.
## TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

The offer and issuance of and the distribution under the Plan of the New Convertible Notes to holders of Allowed DIP Claims, New Common Stock to the holder of Allowed Credit Facility Claims, and New Warrants to holders of Allowed Unsecured Notes Claims, in each instance in exchange for such Claims, shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to, and to the fullest extent permitted by, section 1145 of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, or a claim for an administrative expense in the case concerning the debtor or such affiliate, or principally in such exchange and partly for cash. In reliance upon this exemption, the New Convertible Notes to holders of Allowed DIP Claims, New Common Stock to the holder of Allowed Credit Facility Claims, and New Warrants to holders of Allowed Unsecured Notes Claims, generally will be exempt from the registration requirements of the Securities Act and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, or unless the holder is an "affiliate" (as defined in Rule 405 of the Securities Act) of Reorganized Western Global following the acquisition of such securities. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Under Section 1145(b) of the Bankruptcy Code, an "underwriter" for purposes of the Securities Act is one who, except with respect to ordinary trading transactions, (i) purchases a claim against the debtor with a view to distribution of any security to be received in exchange for the claim, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a chapter 11 plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (iv) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. The legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter. Notwithstanding the foregoing, underwriters or affiliates may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters and affiliates pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code or affiliates of Reorganized Western Global are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

In any case, recipients of new securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Reorganized Western Global currently plans to deliver all New Convertible Notes, New Common Stock, and New Warrants through the electronic records of its transfer agent and registrar, [●]. Should, however, Reorganized Western Global elect, on or after the Effective Date, to reflect all or any portion of the ownership of the New Convertible Notes, New Common Stock, and New Warrants through the facilities of DTC, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such applicable portion of the New Convertible Notes, New Common Stock, and New Warrants, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Western Global in all respects.

DTC and all other Persons and Entities shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Convertible Notes, New Common Stock, and New Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan or otherwise, no Person or Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Convertible Notes, New Common Stock, and New Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services or validly issued, fully paid and non-assessable.

*Listing*.  Upon the Effective Date of the Plan, the New Convertible Notes, New Common Stock, and New Warrants will not be publicly traded or listed on any national securities exchange.  Accordingly, no assurance can be given that a holder of such securities will be able to sell such securities in the future or as to the price at which any sale may occur.

*Legends.*  To the extent certificated, certificates evidencing the New Convertible Notes, New Common Stock, and New Warrants held by holders of 10% or more of the outstanding New Common Stock, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code or recipients of New Common Stock in respect of the New Equity Investment, will bear a legend substantially in the form below:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE RESOLD, REOFFERED FOR RESALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE ISSUER RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## VII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain holders of Claims.  The following summary does not address the U.S. federal income tax consequences to holders of Claims who are paid in full in cash, unimpaired or deemed to reject the Plan and to the holder of the Allowed Credit Facility Claims (as the Debtors understand that the holder of the Allowed Credit Facility Claims has engaged counsel to advise them in connection with the implementation of the Plan).

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury regulations ("**Treasury Regulations**"),

judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of tax counsel or its tax advisors or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS will not assert, or that a court will not sustain, a contrary position than any position discussed herein.

This summary does not address state, local or non-U.S. income or other tax consequences of the Plan, nor does it address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (*e.g.*, non-U.S. persons, broker-dealers, mutual funds, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt entities or organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims or Existing Equity Interests through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, holders whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders in securities that mark-to-market their securities, certain expatriates or former long-term residents of the United States, persons who use the accrual method of accounting and report income on an "applicable financial statement," persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, and persons holding Claims or Existing Equity Interests as part of a straddle, hedging, constructive sale or conversion transaction or other integrated investment, or persons who received their Claim or Existing Equity Interest as compensation). In addition, this summary does not address the Foreign Account Tax Compliance Act or U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the New Common Stock or New Warrants in the secondary market.

The following discussion assumes that all Claims and Existing Equity Interests are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code (unless otherwise indicated), and that the various debt and other arrangements to which the Debtors are parties are respected for U.S. federal income tax purposes in accordance with their form.

The Debtors currently contemplate, and the following discussion also assumes, that (i) Reorganized Western Global will be the existing Western Global corporate entity (and not a reincorporated entity or a new entity), and (ii) each of the Reorganized Debtors that are currently treated as entities disregarded as separate from Western Global for U.S. federal income tax purposes will continue to be disregarded as separate from Western Global following the Effective Date (the "**Current Structure**"). Any deviations from the Current Structure could materially change the U.S. federal income tax consequences of the Plan to the Debtors and to holders of Claims described herein.

*The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. All holders of Claims and Existing Equity Interests are urged to consult their own tax advisors for the U.S. federal, state, local and other tax consequences applicable under the Plan.*

### A.    <u>Consequences to the Debtors</u>

Western Global is a corporation and, thus, a taxable entity for U.S. federal income tax purposes, whereas each of the other Debtors is an entity disregarded as separate from its tax recognized owner (Western Global) for U.S. federal income tax purposes. Accordingly, all business activities and operations of the Debtors are reflected on the U.S. federal income tax return of Western Global.

The Debtors estimate that, as of December 31, 2022, Western Global had net operating loss ("**NOL**") carryforwards of approximately $110 million (all of which are post-2017 NOLs that are subject to an 80% taxable income limitation), approximately $87 million of disallowed business interest expense carryforwards under section 163(j) of the Tax Code and certain other tax attributes. The Debtors expect the amount of their NOLs to increase as a result of operations for their 2023 taxable year (before taking into account the implementation of the Plan). In addition, due to its loan receivable from the ESOP (which is substantially, if not entirely, uncollectable), the aggregate tax basis of the Debtors' assets currently exceeds the aggregate fair market value of such assets. The Debtors do not believe that the ability of Western Global to utilize its NOL carryforwards and other tax attributes are currently limited under section 382 of the Tax Code. However, the amount of the Debtors' NOL carryforwards, 163(j) carryforwards and other tax attributes, and the extent to which any limitations might apply, remain subject to audit and adjustment by the IRS.

As discussed below, in connection with and as a result of the implementation of the Plan, the amount of Western Global's NOL carryforwards, and possibly certain other tax attributes, may be substantially reduced, eliminated or otherwise unavailable. In addition, the subsequent utilization of Western Global's NOL carryforwards and other tax attributes following the Effective Date may be restricted as a result of the implementation of the Plan or subsequent changes in the stock ownership of Western Global. Also, certain changes in the stock ownership of Western Global prior to the Effective Date could restrict the utilization of Western Global's NOL carryforwards and other tax attributes.

### i.    Cancellation of Debt

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets—by the amount of any cancellation of debt ("**COD**") incurred pursuant to a confirmed chapter 11 plan. In applying the attribute reduction rule to the tax basis in assets, the tax law limits the reduction in tax basis to the amount by which the post-emergence tax basis exceeds the debtor's post-emergence liabilities. Also, in the absence of contrary guidance, it appears that section 163(j) disallowed interest expense carryforwards are not subject to reduction under these rules. The amount of COD incurred is generally the amount by which the adjusted issue price of indebtedness discharged exceeds the sum of the amount of cash, the issue price of any debt instrument and the fair market value of any other property exchanged therefor. Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes. If advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.

In connection with the implementation of the Plan, the Debtors expect to incur a substantial amount of COD for U.S. federal income tax purposes. The amount of COD and resulting attribute reduction is primarily dependent on the fair market value of the New Common Stock and New Warrants. Based on the estimated implied enterprise value, the Debtors expect Western Global's NOL carryforwards to be entirely eliminated and significant reductions in other tax attributes. Any reduction in a debtor's tax attributes attributable to COD generally does not occur until after the determination of the debtor's net income or loss for the taxable year in which the COD is incurred (which, in the case of the Debtors, generally will be the taxable year in which the Plan goes effective).

### ii.    Limitation of NOL Carryforwards and Other Tax Attributes

Following the Effective Date, the Debtors' ability to utilize their NOL carryforwards and certain other tax attributes ("**Pre-Change Losses**") may be subject to limitation under section 382 of the Tax Code. Any such limitation would apply in addition to, and not in lieu of, the reduction of tax attributes that results

from COD arising in connection with the Plan and the 80% taxable income limitation on the use of NOL carryforwards.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally are subject to an annual limitation. It is possible, although not currently expected, that the implementation of the Plan would result in an ownership change as of the Effective Date. However, there is no assurance that an ownership change does not occur prior to or on or after the Effective Date, including due to the subsequent issuance of New Common Stock upon the exercise of the New Warrants and/or conversion of the New Convertible Notes. The following addresses the limitations that may apply if an ownership change occurs whether upon implementation of the Plan or otherwise.

### a)       Annual Limitation

In the event of an ownership change, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is generally equal to the product of (A) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) multiplied by (B) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 3.05% for ownership changes occurring in August 2023). For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately after (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets. Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.

In addition, if a loss corporation has a net unrealized built-in gain at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss and deduction), any built-in gains recognized (or, according to a currently effective IRS notice treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its Pre-Change Losses against such built-in gain income in addition to its regular annual allowance. Alternatively, if a loss corporation has a net unrealized built-in loss at the time of an ownership change, then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a loss corporation's net unrealized built-in gain or loss will be deemed to be zero unless the actual amount of such gain or loss is greater than the lesser of (1) $10 million or (2) fifteen percent of the fair market value of its assets (with certain adjustments) before the ownership change. In 2019, the IRS issued proposed regulations that would significantly modify the calculation and treatment of net unrealized built-in gains and losses which generally would be effective prospectively from 30 days after the time they become final, but would not apply with respect to ownership changes pursuant to chapter 11 cases filed prior to the regulations becoming effective. Thus, even if finalized prior to the Effective Date, such regulations should not apply to an ownership change of the Debtors that occurs pursuant to the Plan.

If a corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to the recognition of any built-in gains as of the time of the ownership change).

b)      **Special Bankruptcy Exception**

A special bankruptcy exception to the foregoing annual limitation rules, in section 382(l)(5) of the Tax Code, generally applies when shareholders and "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their equity interests or claims (as applicable), at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan of reorganization. Under this exception, a debtor's Pre-Change Losses are not subject to the annual limitation. However, if this exception applies, the debtor's Pre-Change Losses generally will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. Also, if the reorganized debtor thereafter undergoes another "ownership change" within two years, the annual limitation with respect to such later ownership change would be zero, effectively precluding any future use of their Pre-Change Losses. A debtor that qualifies for this exception may, if it desires, elect not to have the exception apply and instead remain subject to the annual limitation described above. The Debtors have not determined whether or not this exception would apply in connection with the Plan in the event of an ownership change. Accordingly, it is possible that the Debtors would not qualify for this exception or that the Debtors would elect not to apply this exception.

B.      <u>**Consequences to U.S. Holders of Allowed Unsecured Notes Claims and General Unsecured Claims**</u>

Pursuant to the Plan, and in complete and final satisfaction of their Allowed Claims, (1) each holder of an Allowed Unsecured Notes Claim will receive: (i) if a DIP Buyout has not been consummated prior to the Effective Date, its Pro Rata share of the New Warrants, or (ii) if a DIP Buyout has been consummated prior to the Effective Date, its Pro Rata share of the Unsecured Notes Cash Pool, and (2) each holder of an Allowed General Unsecured Claim may (if the holders of the General Unsecured Claims vote to accept the Plan) receive its Pro Rata share of the General Unsecured Cash Pool in one or more distributions on or after the Effective Date.

As used throughout the tax discussion, the term "**U.S. Holder**" means a beneficial owner of an Allowed Claim that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds such Claims, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such a partnership holding any Claims, you should consult your own tax advisor.

This discussion assumes that the Unsecured Notes Claims are not considered "securities" for U.S. federal income tax purposes because, among other things, each such debt obligation had a weighted average maturity at issuance of less than five (5) years. Therefore, this discussion assumes that any receipt of New Warrants by U.S. Holders of Allowed Unsecured Notes Claims, like the receipt of cash, will be a taxable exchange. Whether a debt instrument constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended. If such a Claim were treated as a "security" the U.S. federal income tax consequences to a U.S. Holder thereof would be materially different from that described herein. Accordingly, holders of such Claims are urged to consult their own tax advisors regarding the appropriate status for U.S. federal income tax purposes of such Claims.

### i.    Recognition of Gain or Loss

In general, a U.S. Holder of an Allowed Claim should recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash or the fair market value of New Warrants received in satisfaction of its Claim (other than in respect of any Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the holder's adjusted tax basis in the Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). See section (VII)(B)(ii) below ("Character of Gain or Loss"). For the treatment of distributions in respect of an Allowed Claim for accrued but unpaid interest and possibly OID, see section (VII)(B)(iii) below ("Distributions in Respect of Accrued Interest or OID").

In the event of the subsequent disallowance of any Disputed General Unsecured Claim, it is possible that a U.S. Holder of a previously Allowed General Unsecured Claim may receive additional distributions in respect of its Claim, except to the extent of any portion treated as interest income under the imputed interest provisions of the Tax Code. Accordingly, it is possible that the recognition of any loss realized by a U.S. Holder with respect to an Allowed General Unsecured Claim may be deferred until all General Unsecured Claims are Allowed or Disallowed. Alternatively, it is possible that a U.S. Holder will have additional gain in respect of any additional distributions received due to the disallowance of a Disputed General Unsecured Claim.

A U.S. Holder's tax basis in any New Warrants received generally will equal the fair market value of such New Warrants on the Effective Date. The U.S. Holder's holding period in any New Warrants received will begin on the day following the Effective Date.

### ii.    Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the applicable Allowed Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Allowed Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction with respect to such Claim.

In addition, a U.S. Holder of Claims that acquired its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. A U.S. Holder that purchased its Claim from a prior holder will be considered to have purchased such Claim with "market discount" if the U.S. Holder's adjusted tax basis in its Claim immediately after its acquisition is less than the stated redemption price at maturity of such Claim by at least a statutorily defined *de minimis* amount. Under these rules, any gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as

ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued.  If a U.S. Holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange.

### iii.    Distributions in Respect of Accrued Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of an Allowed Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income).  Conversely, a U.S. Holder may be entitled to recognize a loss to the extent any accrued interest claimed or accrued OID was previously included in its gross income and is not paid in full.  However, the IRS has privately ruled that a holder of a "security" of a corporate issuer in an otherwise tax-free exchange could not claim a current deduction with respect to any accrued but unpaid OID.  Accordingly, it is unclear whether, in similar circumstances or by analogy, any U.S. Holder of an Allowed Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that, except as otherwise required by law (as reasonably determined by the Debtors or the Reorganized Debtors), distributions with respect to Allowed Claims shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any (in contrast, for example, to a pro rata allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest).  See Section 6.16 of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.

*U.S. Holders of Allowed Claims are urged to consult their own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.*

### iv.    Ownership and Disposition of the New Warrants

A U.S. Holder of a New Warrant generally will not recognize gain or loss upon the exercise of such warrant.  A U.S. Holder's tax basis in New Common Stock received upon exercise of a New Warrant will be equal to the sum of the holder's tax basis in the New Warrant and the exercise price.  The holder will commence a new holding period with respect to the New Common Stock received.

If the terms of the New Warrants provide for any adjustment to the number of shares of New Common Stock for which the New Warrants may be exercised or to the exercise price of the New Warrants, such adjustment may, under certain circumstances, result in constructive distributions that could be taxable to the holder of the New Warrants.  Conversely, the absence of an appropriate adjustment may result in a constructive distribution that could be taxable to the U.S. Holders of the New Common Stock.

Upon the lapse or disposition of a New Warrant, the U.S. Holder generally would recognize gain or loss equal to the difference between the amount received (zero in the case of a lapse) and its tax basis in the warrant.  In general, such gain or loss would be a capital gain or loss, long-term or short-term, depending on whether the requisite holding period was satisfied.

C.     __Backup Withholding__

All distributions to U.S. Holders under the Plan are subject to any applicable tax withholding, including backup withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%).  Backup withholding generally applies if the U.S. Holder (i) fails to furnish its social security number or other taxpayer identification number, (ii) furnishes an incorrect taxpayer identification number, (iii) has been notified by the IRS that it is subject to backup withholding as a result of a failure to properly report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  Holders are urged to consult their own tax advisors regarding the potential application of U.S. withholding taxes to the transactions contemplated under the Plan and whether any distributions to them would be subject to withholding.

*The foregoing summary has been provided for informational purposes only.  All holders of Claims and Interests are urged to consult their own tax advisors concerning the federal, state, local and other tax consequences applicable under the Plan.*

# VIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.  The factors below should not be regarded as the only risks associated with the Plan or its implementation.

A.     __Certain Bankruptcy Law Considerations__

   i.     __General__

Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' business.  Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key vendors, customers, and employees.  The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

   ii.     __Risk of Non-Confirmation of Plan__

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan with respect to each Debtor, and even if Classes 3, 4, 5, and 6 (the "**Voting Classes**") vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects or is deemed to reject the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  If the Plan is not confirmed

with respect to each Debtor, it is unclear what distributions (if any) holders of Claims against, or Interests in, the applicable Debtors ultimately would receive with respect to their Claims or Interests in any subsequent plan.

### iii.    Risk of Failing to Satisfy the Vote Requirement

In the event that the Debtors are unable to get sufficient votes from the Voting Classes, the Debtors may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to holders of Allowed Claims and Interests as those proposed in the Plan.

### iv.    Risk of Non-Consensual Confirmation

In the event that any impaired class of Claims or Interests does not accept or is deemed not to accept the Plan, the Bankruptcy Court may nevertheless confirm such Plan at the request of the Debtors if at least one impaired class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes.  The Debtors believe that the Plan satisfies these requirements.

### v.    Risk Related to DIP Facility

The DIP Facility is intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases.  If the Chapter 11 Cases take longer than expected to conclude, or in the event of a breach of a milestone or another event of default under the DIP Term Sheet or DIP Order, which could occur if the Plan is not confirmed on the proposed timeline, the Debtors may exhaust or lose access to their financing. There is no assurance that they will be able to obtain additional financing from their existing lenders or otherwise.  In either such case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

### vi.    Claims Could Be More than Projected

There can be no assurance that the estimated Allowed amount of Claims will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results. Therefore, the actual amount of Allowed Claims may vary from the Debtors' projections and feasibility analysis, and the variation may be material.

### vii.    Risk of Non-Occurrence of Effective Date

There can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### viii.     Conversion to Chapter 7 Cases

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. Based on the liquidation analysis, which is attached hereto as **Exhibit D** (the "**Liquidation Analysis**"), the Debtors believe that under the Plan all holders of Impaired Claims and Interests will receive property with a value not less than the value such holders would receive in a liquidation under chapter 7 of the Bankruptcy Code.

### B.     Risks Relating to the Plan

### i.     Conditions to Consummation of Plan

Although the Debtors believe that they will be able to consummate the Restructuring, there are conditions to the Effective Date, including that the Plan be confirmed on or before the milestones provided for in the DIP Term Sheet and Restructuring Support Agreement.  Accordingly, the Debtors are not certain that the Restructuring will be consummated as planned.

### C.     Risks Relating to Debtors' Business and Financial Condition

### i.     Risks Associated with Debtors' Business and Industry

Risks associated with the Debtors' business and industry include, but are not limited to, the following:

- the Debtors' dependence on contracts with government and commercial customers;

- general macroeconomic conditions in the United States and in the particular regions in which the Debtors operate;

- pandemics and other global health emergencies;

- geopolitical conflicts;

- changes in the rules and regulations of the Debtors' regulators;

- fuel price volatility;

- increasing aircraft maintenance costs;

- the Debtors' ability to attract, motivate, and retain officers and other key personnel;

- the Debtors' ability to maintain high utilization of their aircraft at favorable rates;

- the Debtors' ability to maintain all necessary licenses and approvals for the services they provide to their customers;

- potential disruption from natural hazards, including equipment failure, power loss, and other events or occurrences;

- robust competition in the industry;

- compliance with restrictive covenants under the DIP Term Sheet; and

- the Debtors' dependence and relationship with their suppliers and vendors.

The Debtors operate in a highly competitive industry, and they may not be able to maintain or increase their current revenues. The Debtors' competitors may develop services that are equal or superior to those the Debtors provide or that achieve greater market acceptance and brand recognition than the Debtors achieve. It also is possible that new competitors may emerge and rapidly acquire a significant market share in any of the Debtors' business segments by offering lower rates that the Debtors are unable or unwilling to match. The Debtors' ability to compete effectively depends in part on their ability to achieve a competitive cost structure. If they are unable to do so, then their business, financial condition, and operating results would be adversely affected. If the Debtors fail to successfully respond to competitive pressures in this industry or to effectively implement their strategies to respond to these pressures, their operating results may be negatively affected. Some of the Debtors' principal competitors have greater financial resources than the Debtors and either have used those resources or may in the future use those resources to take steps that may have an adverse effect on the Debtors' competitive position and financial performance.

The foregoing factors are not exhaustive, and new factors may emerge or changes to the foregoing factors may occur that could impact the Debtors' business.

### ii.    Post-Effective Date Indebtedness

Following the Effective Date, the DIP Loans will convert into the New Convertible Notes on a dollar-for-dollar basis. The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, the Reorganized Debtors' compliance with affirmative and negative covenants, the applicable interest rate under the New Convertible Notes Indenture, as well as future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt obligations as well as fund necessary capital expenditures and investments. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### D.    Factors Relating to Securities to Be Issued

### i.    Market for Securities

There is currently no market for the New Convertible Notes, New Common Stock, and New Warrants and there can be no assurance as to the development or liquidity of any market for any such securities. The Reorganized Debtors are under no obligation to list any securities on any national securities exchange. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors. In addition, holders of New Convertible Notes, New Common Stock, and New Warrants may be subject to certain restrictions contained in a shareholders agreement or limited liability company agreement (as applicable) which may include restrictions on the

ability to transfer, as well as other limitations associated with, the New Convertible Notes, New Common Stock, and New Warrants.  In addition, persons who receive the New Common Stock pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.  Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

### ii.    Potential Dilution

The ownership percentage represented by the New Common Stock distributed on or after the Effective Date pursuant to the Plan may be subject to dilution from shares that may be issued post-emergence, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued at or post-emergence, including any New Common Stock (i) issuable upon conversion of the New Convertible Notes, (ii) issuable upon exercise of the New Warrants, and (iii) that may be issued by Reorganized Western Global to the ESOP Trust.

In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Common Stock.  The amount and dilutive effect of any of the foregoing could be material.

### iii.    Significant Holders of New Common Stock

The holder of the Credit Facility Claims is expected to acquire significant New Common Stock pursuant to the Plan. As a result, the holder may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors.  More specific details regarding minority shareholder rights will be provided in any Amended Organizational Documents and any equity holders' agreement provided for in the Plan Supplement, which will also, among other things, specify which entity will issue the New Common Stock.

### iv.    New Common Stock Subordinated to Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Stock would rank below all debt claims against the Reorganized Debtors.  As a result, the holder of the New Common Stock will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

### v.    Trading Value of New Common Stock

The value of the Reorganized Debtors may not be represented by the trading value of the New Common Stock in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities. The actual market price of the New Common Stock is likely to be volatile.  Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Stock to rise and fall.  Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should

not be construed as reflecting, values that will be attained for the New Common Stock in the public or private markets.

### vi.    U.S. Citizenship Subject to DOT Review

In conjunction with its reorganization, Western Global is undergoing a continuing fitness review by the DOT, which will include a review of its citizenship.  On an ongoing basis, the DOT reviews the economic fitness of air carriers upon the occurrence of certain events, including upon substantial changes in ownership.  In the event that Reorganized Western Global is not a United States Citizen as determined by the DOT under applicable federal law, it will lose its eligibility to hold its DOT and FAA authorizations, which are subject to revocation.  In the event Reorganized Western Global does not qualify as a United States Citizen, the Reorganized Debtors automatically would be deemed a non-United States Citizen.

### vii.    Reorganized Western Global Common Stock Ownership

DOT regulations require that no more than twenty-five percent (25%) of the voting stock of Reorganized Western Global may be owned or controlled by non-United States Citizens and, conversely, that at least seventy-five percent (75%) of the voting stock of Reorganized Western Global must be owned and controlled by United States Citizens.  Upon the Effective Date, 100% of the voting stock of Reorganized Western Global will be owned by DKB Partners.  However, upon a conversion of the New Convertible Notes to equity in accordance with the terms of the New Convertible Notes Indenture, the equity of Reorganized Western Global will also be owned by the converting holders of the New Convertible Notes. It is possible that at the time of conversion, such holders may not be United States Citizens and, therefore, Reorganized Western Global could be at risk of losing its eligibility to hold its DOT and FAA authorizations.  The Debtors intend to work with the holders of the New Convertible Notes to develop a structure to avoid the foregoing risk if upon conversion of the New Convertible Notes, more than twenty-five percent (25%) of the voting stock of Reorganized Western Global would be owned by non-United States Citizens.

### E.    Risks Relating to Exit Obligations

### i.    Insufficient Cash Flow to Meet Debt Obligations

On the Effective Date, on a consolidated basis, it is expected that the Reorganized Debtors will have total outstanding secured indebtedness of approximately $77.3 million.  This level of expected indebtedness and the funds required to service such debt could, among other things, make it more difficult for the Reorganized Debtors to satisfy their obligations under such indebtedness, increasing the risk that they may default on such debt obligations.

The Reorganized Debtors' earnings and cash flow may vary significantly from year to year. Additionally, the Reorganized Debtors' future cash flow may be insufficient to meet their debt obligations and commitments. Any insufficiency could negatively impact the Reorganized Debtors' business.  A range of economic, competitive, business, and industry factors will affect the Reorganized Debtors' future financial performance and, as a result, their ability to generate cash flow from operations and to pay their obligations under the New Convertible Notes.  Many of these factors are beyond the Reorganized Debtors' control.

If the Reorganized Debtors do not generate enough cash flow from operations to satisfy their debt obligations, they may have to undertake alternative financing plans, such as refinancing or restructuring debt, selling assets, reducing or delaying capital investments, or seeking to raise additional capital.

It cannot be assured, however, that undertaking alternative financing plans, if necessary, would allow the Reorganized Debtors to meet their debt obligations.  An inability to generate sufficient cash flow to satisfy their debt obligations or to obtain alternative financing could materially and adversely affect the Reorganized Debtors' ability to make payments on their debt obligations and their business, financial condition, results of operations, and prospects.

### ii.    Failure to Perfect Security Interests in Collateral

The failure to properly perfect liens on the collateral that is subject to the New Convertible Notes (the "**Exit Collateral**") could adversely affect the collateral agent's ability to enforce rights with respect to the Exit Collateral for the benefit of the holders of the New Convertible Notes.  In addition, applicable law requires that certain property and rights acquired after the grant of a general security interest or lien can only be perfected at the time such property and rights are acquired and identified.  There can be no assurance that the collateral agent will monitor, or that Reorganized Western Global will inform the trustee or the collateral agent of, the future acquisition of property and rights that constitute Exit Collateral, if any, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Exit Collateral.  The collateral agent has no obligation to monitor the acquisition of additional property or rights that constitute Exit Collateral or the perfection of any security interests therein.  Such failure may result in the loss of the practical benefits of the liens thereon or of the priority of the liens securing the New Convertible Notes against third parties.

### iii.    Casualty Risk of Collateral

The Reorganized Debtors will be obligated to maintain adequate insurance or otherwise insure against hazards as is customarily done by companies having assets of a similar nature in the same or similar localities. There are, however, certain losses that may either be uninsurable or not economically insurable, in whole or in part. As a result, it is possible that the insurance proceeds will not compensate the Reorganized Debtors fully for their losses.  If there is a total or partial loss of any of the pledged collateral, the insurance proceeds received may be insufficient to satisfy the New Convertible Notes.

### iv.    Any Future Pledge of Collateral

Any future pledge of additional collateral in favor of the collateral agent might be avoidable by the pledgor (as a subsequent debtor in possession) or by its trustee in bankruptcy if certain events or circumstances exist or occur, including, among others, if the pledgor is insolvent at the time of the pledge, the pledge permits the holders of the New Convertible Notes to receive a greater recovery than if the pledge had not been given, and a bankruptcy proceeding in respect of the pledgor is commenced within ninety (90) days following the pledge, or, in certain circumstances, a longer period.

### F.    Additional Factors

### i.    Debtors Could Withdraw Plan

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.  If the Debtors select an alternative transaction, certain parties may assert that (i) the Plan and Disclosure Statement may require material modifications to reflect the terms of the alternative transaction and the effect such transaction has on recoveries for unsecured creditors, and (ii) a re-solicitation of votes in respect of the modified Plan may be required.  The Debtors reserve all rights with respect thereto.

### ii.    Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### iii.    No Representations Outside Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### iv.    No Legal or Tax Advice Is Provided by Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant or financial advisor as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### v.    No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

### vi.    Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and Interests, and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

### vii.    Certain Tax Consequences

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Article VII hereof.

## IX.
## VOTING PROCEDURES AND REQUIREMENTS

### A.    Voting Instructions and Voting Deadline

Only holders of, Class 3 Claims (Credit Facility Claims), Class 4 Claims (Unsecured Notes Claims), and Class 5 Claims (General Unsecured Claims) (collectively, the "**Eligible Holders**") are entitled to vote to accept or reject the Plan.  The Debtors are providing copies of this Disclosure Statement

(including all exhibits and appendices) and related materials and a ballot in the Solicitation Packages to the Eligible Holders.

Each ballot contains detailed voting instructions.  Each ballot also sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the date for determining which creditors are entitled to vote on the Plan (the "**Voting Record Date**"), and the applicable standards for tabulating ballots.  The Voting Record Date for determining which holders are entitled to vote on the Plan is [●], 2023.

Please complete the information requested on the ballot, sign, date, and indicate your vote on the ballot, and return the completed ballot in accordance with the instructions set forth on the ballot.

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN [●], 2023 at 4:00 P.M. (PREVAILING EASTERN TIME) (THE "**VOTING DEADLINE**").

AN OTHERWISE PROPERLY COMPLETED, EXECUTED, AND TIMELY RETURNED BALLOT FAILING TO INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATING BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED IN DETERMINING THE ACCEPTANCE OR REJECTION OF THE PLAN.

If you are an Eligible Holder and you did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact Stretto, Inc. ("**Stretto**", or, the "**Voting Agent**") by emailing WGAInquiries@stretto.com with a reference to "Western Global Airlines" in the subject line.

**B.**       **Parties Entitled to Vote**

Claims in Class 3 (Credit Facility Claims), Class 4 (Unsecured Notes Claims), and Class 5 (General Unsecured Claims) of the Plan are impaired and Eligible Holders in such Class are entitled to vote to accept or reject the Plan.  Claims and Interests in all other Classes are either unimpaired and presumed to accept or impaired and deemed to reject the Plan and are not entitled to vote.

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by Class 8 Interests (Existing Equity Interests).  Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or equity interests.  Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Article X hereof.

**i.**       **Eligible Holders**

Except as set forth in the Disclosure Statement Order, an Eligible Holder that holds a Claim should vote on the Plan by completing and signing a ballot and returning it directly to the Voting Agent on or before the Voting Deadline (a) using the enclosed pre-addressed, postage-paid return envelope or (b) via the customized online balloting portal on the Debtors' case website to be maintained by the Voting Agent. The Voting Agent will not accept ballots submitted by e-mail or facsimile.

C.        **Agreements Upon Furnishing Ballots**

The delivery of an accepting ballot pursuant to one of the procedures set forth above will constitute the agreement of the Claim holder with respect to such ballot to accept (i) all of the terms of, and conditions to, the solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.5, 10.6 and 10.7 therein.  All parties in interest retain their right to object to confirmation of the Plan.

D.        **Change of Vote**

Any party that has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed ballot for acceptance or rejection of the Plan.

E.        **Waivers of Defects, Irregularities, etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of ballots will be determined by the Voting Agent and/or the Debtors, as applicable.  The Debtors reserve the right to reject any and all ballots submitted by any of their respective Claim holders not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular ballot by any of their creditors.  The interpretation (including the ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

F.        **Miscellaneous**

Unless otherwise ordered by the Bankruptcy Court, ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Debtors, in their sole discretion may request that the Voting Agent attempt to contact such voters to cure any such defects in the ballots.  If you cast ballots received by the Voting Agent on the same day, but which are voted inconsistently, such ballots will not be counted.  An otherwise properly executed ballot that attempts to partially accept and partially reject the Plan will not be counted as an acceptance of the Plan.

The ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Eligible Holders that actually vote will be counted.  The failure of a holder to deliver a duly executed ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstention will not be counted as a vote for or against the Plan.

Except as provided above or in the Disclosure Statement Order, unless the ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such ballot,

the Debtors may, in their sole discretion, reject such ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

## X.
## CONFIRMATION OF PLAN

### A.  Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  The Confirmation Hearing has been scheduled for [●], 2023, at [●].  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Confirmation Hearing, at any subsequent adjourned Confirmation Hearing, or pursuant to a notice filed on the docket of the Chapter 11 Cases.

### B.  Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and applicable local rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' Estates or properties, the basis for the objection and the specific grounds thereof, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order:

    **i.**    **The Debtors at:**

        Western Global Airlines, Inc.
        9260 Estero Park Commons Blvd.
        Suite 200
        Estero, FL 33928
        Attn:   Robert Del Genio and Tim McDonagh
        Email:  robert.delgenio@fticonsulting.com
              tim.mcdonagh@fticonsulting.com

    **ii.**    **Proposed counsel to the Debtors at:**

        Weil, Gotshal & Manges LLP
        767 Fifth Avenue
        New York, NY 10153
        Attn:   Gary T. Holtzer, Esq., Candace M. Arthur, Esq.,
              and Jason H. George, Esq.
        Telephone:  (212) 310-8000
        Facsimile:  (212) 310-8007
        Email:  gary.holtzer@weil.com
              candace.arthur@weil.com
              jason.george@weil.com

        -and-

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn:    Mark D. Collins, Esq., Zachary I. Shapiro, Esq.,
          and Amanda R. Steele, Esq.
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Email:  collins@rlf.com
          shapiro@rlf.com
          steele@rlf.com

iii.    **Office of the U.S. Trustee at:**

Office of the U.S. Trustee for the District of Delaware
844 King Street, Suite 2207
Wilmington, Delaware 19801
Attn:    Linda Richenderfer, Esq.

iv.    **Counsel to the DIP Agent at:**

[●]

v.    **Counsel to DKB Partners at:**

Young Conaway Stargatt & Taylor, LLP
Rodney Square, 1000 North King Street
Wilmington, DE 19801
Attn:    Pauline Morgan, Esq., Craig D. Grear, Esq.,
          and Sean Greecher, Esq.
Email:  pmorgan@ycst.com
          cgrear@ycst.com
          sgreecher@ycst.com

vi.    **Counsel to the Ad Hoc Group at:**

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:    Alice Eaton, Esq., Sean Mitchell, Esq.,
          and Kyle R. Satterfield Esq.
Email:  aeaton@paulweiss.com
          smitchell@paulweiss.com
          ksatterfield@paulweiss.com

vii.    **Proposed counsel to the Creditors' Committee at:**

[●]

C.     **Requirements for Confirmation of Plan**

    i.     **Requirements of Section 1129(a) of the Bankruptcy Code**

        a)     **General Requirements**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

    (i)     the Plan complies with the applicable provisions of the Bankruptcy Code;

    (ii)     the Debtors have complied with the applicable provisions of the Bankruptcy Code;

    (iii)     the Plan has been proposed in good faith and not by any means forbidden by law;

    (iv)     any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

    (v)     the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of the holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

    (vi)     with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code;

    (vii)     except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

    (viii)     except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive, at the option of

the Debtors or the Reorganized Debtors, as applicable:  (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due, or (b) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code;

        (ix)     at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

        (x)     confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

        (xi)     all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date.

b)     **Best Interests Test**

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan, or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of Impaired Claims and Interests will receive property with a value not less than the value such holders would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests, and (ii) the Liquidation Analysis.

Specifically, the Debtors believe the Plan provides better value for creditors than a liquidation on account of: (i) the New Equity Investment, which will help enable the Debtors to emerge as a going concern from these Chapter 11 Cases; (ii) the DIP Lenders' agreement to exchange the DIP Loans for New Convertible Notes; (iii) the opportunity for the holder of Credit Facility Claims to receive New Common Stock; (iv) the opportunity for holders of Unsecured Notes Claims to receive either the New Warrants or Unsecured Notes Cash Pool, (v) the holders of General Unsecured Claims to receive the General Unsecured

Cash Pool if the Class of holders of General Unsecured Claims votes to accept the Plan; and (vi) the assumption of contracts and related cure payments.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates, which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  The Liquidation Analysis is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

      c)      **Feasibility**

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless contemplated by the Plan. The Effective Date of the Plan will not occur unless the Restructuring Transactions contemplated by the Plan close.  Upon such closing the Reorganized Debtors will have sufficient funds to make the Distributions required under the Plan.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for a further reorganization.

      d)      **Equitable Distribution of Voting Power**

On or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtors will be amended as necessary to satisfy the provisions of the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity securities, and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

      ii.      **Additional Requirements for Non-Consensual Confirmation**

Under the Bankruptcy Code, a Class accepts a chapter 11 plan if (i) holders of two-thirds (2/3) in amount and (ii) with respect to holders of Claims, more than a majority in number of the allowed claims in such class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept the Plan.  Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

In the event that any Impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code.  Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

Pursuant to the Plan, holders of Interests in Class 8 (Existing Equity Interests) will not receive a distribution and are thereby deemed to reject the Plan.  However, the Debtors submit that they satisfy the "unfair discrimination" and "fair and equitable" tests, as discussed in further detail below.

a)      **Unfair Discrimination Test**

The "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests.  This test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test.

b)      **Fair and Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to dissenting classes, the test sets different standards depending on the type of claims in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" test with respect to any dissenting Classes, as further explained below.

(i)      <u>Secured Creditors</u>

The Bankruptcy Code requires that each holder of an impaired secured claim either (a) retain its liens on the property to the extent of the allowed amount of its secured claim and receive deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim, (b) have the right to credit bid the amount of its claim if its property is sold and retain its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (c) receive the "indubitable equivalent" of its allowed secured claim.

(ii)      <u>Unsecured Creditors</u>

The Bankruptcy Code requires that either (a) each holder of an impaired unsecured claim receive or retain under the plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and equity interests that are junior to the claims of the dissenting class not receive any property under the plan.  The Plan provides that each holder of an Impaired Unsecured Claim shall receive the treatment summarized above in Article V of this Disclosure Statement.

(iii)      <u>Equity Interests</u>

The Bankruptcy Code requires that either (a) each holder of an equity interest receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock and (ii) the value of the stock, or (b) the holders of equity interests that are junior to any dissenting class of equity interests not receive any property under the plan.  Pursuant to the Plan, all Existing Equity Interests will be cancelled and the holders of Existing Equity Interests will neither receive nor retain any property on account of such interests.

iii.      **The Debtors' Releases and Third-Party Releases**

Section 10.6 of the Plan provides a release of certain claims and Causes of Action of the Debtors, the Reorganized Debtors, and the Estates against the Released Parties in exchange for good and valuable consideration and valuable compromises made by the Released Parties (the "**Debtors' Releases**").  The

Debtors' Releases do not release any claims or Causes of Action arising after the Effective Date against any party or affect the rights of the Debtors or Reorganized Debtors to enforce the terms of the Plan or any right or obligation arising under the Definitive Documents that remain in effect after the Effective Date. Section 10.6 of the Plan provides for the consensual release of claims and Causes of Action held by the Releasing Parties against the Released Parties (the "**Third-Party Releases**", and together with the Debtor Releases, the "**Releases**").

The Debtors believe, and will be prepared to demonstrate at the Confirmation Hearing, that the Releases and exculpation provisions of the Plan are consistent with applicable law. The substantial contributions made by the Debtors' directors and officers to the Debtors' restructuring include, but are not limited to: (a) negotiating the restructuring, as embodied in the Plan; (b) preserving the Debtors' operations and maintaining ongoing vendor relationships; and (c) devoting significant time to navigating the Debtors through these Chapter 11 Cases in addition to their regular duties.

## XI.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (a) the preparation and presentation of an alternative plan of reorganization, (b) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (c) a liquidation under chapter 7 of the Bankruptcy Code.

### A.    Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period during which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either: (a) a reorganization and continuation of the Debtors' business or (b) an orderly liquidation of the Debtors' assets. The Debtors, however, submit that the Plan, as described herein, enables their creditors and interest holders to realize the most value under the circumstances.

### B.    Alternate Sale Under Section 363 of Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets through a stand-alone alternative transaction under section 363 of the Bankruptcy Code. Upon analysis and consideration of this alternative, the Debtors do not believe that a stand-alone alternative sale of their assets under section 363 of the Bankruptcy Code (as opposed to the consummation of an alternative transaction pursuant to the Plan) would yield a higher recovery for holders of Claims and Interests than the Plan.

### C.    Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be appointed to liquidate the assets of the Debtors for distribution to the Debtors' creditors in accordance with the priorities established by the Bankruptcy Code. The effect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis.

As reflected under the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 would result in no distributions to holders of Unsecured Notes Claims, General Unsecured Claims, and Existing Equity Interests.

## XII.
## RECOMMENDATION OF DEBTORS

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Class 3, Class 4, and Class 5 to vote in favor thereof.

Dated:  August 30, 2023
    [●]

                                    Respectfully submitted,

                                    By: _____
                                    Name:    [●]
                                    Title:    [●]

                                    on behalf of Western Global Airlines, Inc. and its
                                    Debtor affiliates